CITY OF NEWARK, A MUNICIPAL CORPORATION, CITY OF ELIZABETH, A MUNICIPAL CORPORATION, ESTHER G. BERTONI, LOUELLA DeVITA, LOIS BERTONI, LOUIS B. BERTONI; ESTHER G. BERTONI, STEPHEN DUDIAK AND ESTELLE SMITH, TRUSTEES UNDER THE LAST WILL AND TESTAMENT OF LOUIS P. BERTONI FOR THE BENEFIT OF LOUELLA DeVITA, LOUIS B. BERTONI AND LOIS BERTONI; MARION BOSCIA; THE ESTATE OF DAVID COLEMAN; VINCENT P. MAZZOLA; SARA TACCETTA; ANTHONY TACCETTA, JR., BARBARA TACCETTA SANTANGELO AND FRANK STAMATO, PARTNERS TRADING AS C & S DEVELOPMENT COMPANY; NEW JERSEY LAND TITLE INSURANCE ASSOCIATION, A NEW JERSEY CORPORATION, APPELLANTS, v. NATURAL RESOURCE COUNCIL IN THE DEPARTMENT OF ENVIRONMENTAL PROTECTION, AS THE TIDELAND AGENT OF THE STATE OF NEW JERSEY; NAVIGATION BUREAU OF THE DIVISION OF MARINE SERVICES IN THE DEPARTMENT OF ENVIRONMENTAL PROTECTION, AS THE AGENT DESIGNATED BY *N.J.S.A.* 13:1B–13:2 FOR THE PERFORMANCE OF TITLE STUDIES AND SURVEYS OF THE MEADOWLANDS THROUGHOUT THE STATE OF NEW JERSEY; WILLIAM T. CAHILL, GOVERNOR OF NEW JERSEY, GEORGE F. KUGLER, JR., ATTORNEY GENERAL, ROBERT J. FALCEY, ACTING SECRETARY OF STATE, WALTER WECHSLER, STATE COMPTROLLER, WILLIAM E. MARFUGGI, STATE TREASURER, AND EDWARD KILPATRICK, ACTING COMMISSIONER OF EDUCATION, AS THE TRUSTEES FOR THE SUPPORT OF PUBLIC SCHOOLS DESIGNATED BY *N.J.S.A.* 18A:56–1; AND THE STATE OF NEW JERSEY, RESPONDENTS.

Argued February 4, 1980—Decided May 15, 1980.

532

John R. Weigel argued the cause for appellants.

Elias Abelson, Assistant Attorney General, argued the cause for respondents (John J. Degnan, Attorney General of New

Jersey, Attorney; *Stephen Skillman*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

SCHREIBER, J.

This case concerns the long-standing and continuing dispute over claims to the ownership of New Jersey's tidally-flowed lands. It is before us as an appeal from an Appellate Division decision upholding the validity of certain claims maps prepared by the State depicting its purported ownership of property in the Hackensack and Newark-Elizabeth meadowlands.

The maps in question were prepared by the Natural Resource Council (NRC) of the State Department of Environmental Protection (DEP) pursuant to *N.J.S.A.* 13:1B–13.1 *et seq.* That statute directed the NRC to undertake title studies and surveys of the State's meadowlands to determine what portions were state-owned. It was a response to our decision in *O'Neill v. State Highway Dept.*, 50 *N.J.* 307, 320, 323 (1967), where we held that the State owns in fee simple all lands flowed by the tide up to the mean high water line, and exhorted the State "[a]s a matter of good housekeeping, [to] do what is feasible to catalogue [its] far-flung [tidelands] holdings . . . ." [1]

---

[1] *O'Neill* defined the mean high water line as "the line formed by the intersection of the tidal plane of mean high tide with the shore." 50 *N.J.* at 323. The mean high tide was in turn defined as "the medium between the spring and the neap tides"—the average of all high tides over a period of 18.6 years. *Id.* at 323–324.

In defining State ownership in terms of areas lying below mean high tide, the *O'Neill* Court was careful to add that the State cannot expand its ownership claims by undertaking artificial works, like ditching, which "enable[ ] the tide to ebb and flow on lands otherwise beyond it." *Id.* at 324. Similarly, the private owner cannot today enlarge his holdings by excluding the tide. Prior to the two-step repeal of the "Wharf Act," *L.*1851, *p.* 335 (in 1869 as to certain tidal lands, *L.*1869, *p.* 1017, and in 1891 as to the remaining lands, *L.*1891, *p.* 216), the riparian owner had a revocable license to fill-in and thereby acquire a fee simple to lands down to mean low water. *O'Neill*, 50 *N.J.* at 324–325.

Following the NRC's adoption of the maps, the appellants Newark and Elizabeth, along with the New Jersey Land Title Insurance Association, Inc., and several named individuals and estates whose titles were threatened by the sovereign ownership claims reflected in the maps, sought to invalidate the maps on the ground that the NRC's mapping methodology failed to comply with the requirements set out in *N.J.S.A.* 13:1B–13.3.

In mapping the Hackensack Meadowlands, the NRC relied on a novel technique of biological delineation instead of using the traditional tidal mapping program of tide gauging to locate mean high water points in the marsh and surveying to connect those points into a mean high water line. The NRC method involved the analysis of color infrared aerial photographs of the meadows. This procedure was premised on the theory that there is a correlation between the various spectral reflectance patterns of *Phragmites communis,* a reedlike grass which grows extensively in the Hackensack meadows, and the extent of tidal inundation where the plants exist. Certain color patterns are said to indicate areas which are regularly flowed by the tide, while other patterns indicate areas not susceptible to tidal flow. The data from the biological delineation was then supplemented with information from earlier tide gauging and from a number of historical sources.

In mapping the mean high water line in the Newark-Elizabeth meadows, the NRC again rejected tide gauging and surveying, this time in favor of historical sources which depicted the location of tidal creeks and streams in the meadowlands prior to their development. These locations were then adjusted for tidal overflow on the basis of data describing the overflow in the Tuckerton meadows in southern New Jersey. NRC claimed that reliance on historical sources was necessary given the extensive filling and development of the Newark-Elizabeth meadows, where Newark Airport, the Port of Newark-Elizabeth and an extensive network of highways are now located.

In addition to challenging the mapping methodology used, the appellants also argued that the State's attempt to claim sovereign ownership of tidally-flowed, but non-navigable, interior meadowlands violated principles of state law and the Due Process Clause of the Fourteenth Amendment. Finally, they asserted that these claims of title should be barred by the application of principles of estoppel.

Faced with the appellants' challenge, the Appellate Division remanded the matter to Judge Trautwein in the Law Division, for the purpose of creating an adequate administrative record, R. 2:5-5(b), and for proposed findings of fact and conclusions of law. After hearing nearly nine months of testimony (the record consists of more than 3,000 pages of transcript and 591 exhibits), Judge Trautwein filed his findings in August 1978. He concluded that the maps certified by the NRC had been promulgated and published in accordance with *N.J.S.A.* 13:1B–13.4, and represented a reasonable implementation of the mandated duty to prepare such maps in accordance with *N.J.S.A.* 13:1B–13.2 and 13.3. Implicit in this conclusion was the finding that the methodology used by the NRC in mapping conformed with those legislative directives.

The Appellate Division affirmed Judge Trautwein's findings in an unreported *per curiam* decision. The court reasoned that, notwithstanding the arguable merits of the appellants' challenge, there was competent expert testimony and evidence in the record to support the delineation program adopted by the NRC, as well as its decision to forego a traditional mapping program based on tide gauging and surveying. Given the presumption of validity of the NRC's mapping as administrative action pursuant to an express statutory directive, the conflicting evidence in the record and the technical nature of the subject matter, the court felt compelled to affirm Judge Trautwein's findings. The court concluded that its limited scope of review precluded it from choosing between the contending views of experts on debatable subject matter. We granted plaintiffs'

petition and the Attorney General's cross-petition for certification.   81 *N.J.* 335 (1979).

I

Enacted in 1969, *N.J.S.A.* 13:1B–13.2 directed the NRC "to undertake title studies and surveys of meadowlands throughout the State and to determine and certify those lands which it [found to be] State owned lands."   Upon completion of each study and survey, the council was to publish a map portraying the results and clearly indicating those areas claimed by the State.   *N.J.S.A.* 13:1B–13.4.   In making those studies and preparing those maps, the NRC was directed "to take into account" four categories of source material:

(1) the mean high water line as established by the United States Coast and Geodetic Survey,

(2) the nature of the meadowlands' vegetation,

(3) artificial changes in land or water elevations, and

(4) such other historical or scientific data which, in the opinion of the council, are relevant in determining whether a parcel of land is now or was formerly flowed by mean high tide. [*N.J.S.A.* 13:1B–13.3].

The first area to be surveyed was the Hackensack meadowlands and the maps were to be completed by July 1969.   *N.J.S.A.* 13:1B–13.2.

The DEP's initial response to this mandate was the issuance of its "Gray and White" map in January 1970, which depicted the State's purported ownership claims in the Hackensack meadowlands.   This map was suppressed by Judge Trautwein in the Law Division in September 1971.   DEP's Office of Environmental Analysis immediately undertook a second effort.   It culminated in the NRC's publication and certification of the 36 Hackensack meadowlands base maps with claims overlays and the single Newark-Elizabeth base map with its claims overlay. Appellants challenge the accuracy of these documents.

Regarding the Hackensack claims maps, the appellants contend that the agency failed to adhere to the four-part guidelines in *N.J.S.A.* 13:1B–13.3. They allege that the list of source materials in that statutory section evidences a legislative desire that the agency undertake a mapping program based on broad and balanced data. They assert that the NRC failed to employ a balanced program utilizing tide gauging and surveying to determine the current line of mean high water, and failed to avail itself of all historical sources to depict areas formerly flowed by the tide. Instead, the NRC relied almost entirely on a single, previously untested biological program which was at best capable of depicting tidally-flowed areas rather than a mean high water line.

In addition, they contend that the biological delineation program was itself unreliable and theoretically unsound. Their experts questioned the validity of the alleged correlation between *Phragmites'* spectral reflectance patterns and the extent of tidal flow. Some testimony indicated that reflectance patterns were inherited characteristics with no known environmental cause. Other testimony indicated that reflectance patterns were influenced by many environmental factors other than tidal flow, including wind, season, and water and soil quality. The experts criticized the NRC's mapping program for ignoring these factors. The correlation between tidal flow and spectral reflectance was allegedly based on inaccurate field work and inadequate sampling. Experts noted inconsistencies between the correlation data supporting the maps and the information obtained in the pilot project.

In challenging the validity of the Newark-Elizabeth map, the appellants attacked the State's claims to the ten feet extending from the banks of the now filled-in creeks and streams as they appeared in the historical source material. The NRC based its claim of the additional ten feet on an alleged resemblance between the present tidal overflow in Little Egg Harbor in Ocean County and in the creeks in the Newark-Elizabeth mead-

ows as they appeared prior to filling. The appellants' experts criticized the agency for failing to compare the vegetation, soil, subsoil and drainage of the two areas prior to the extrapolation. They also questioned the agency's almost total reliance on a single 1890 map and its disregard of other available surveys in depicting formerly tidally-flowed areas.

Finally, appellants argue that the Legislature intended the council to produce only highly accurate maps and that the resulting mean high water lines must be carefully scrutinized. This is premised on the belief that the State's claims maps will cast doubt on the validity of the titles of numerous private property owners and render unmarketable a sizeable area of land pending the piecemeal resolution of the State's claims in individual quiet title suits. The appellants' position is that the Legislature obviously wished to avoid the unnecessary slander of title and its adverse effect on efficient land use. Thus, it must have intended the maps to be of such precision that they would likely survive a quiet title dispute.

In adjudicating the appellants' claims, we note at the outset the strong presumption of reasonableness that an appellate court must accord an administrative agency's exercise of statutorily delegated responsibility. The scope of judicial review in cases of this kind was recently enunciated by Justice Pashman in *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562–563 (1978), where he emphasized that "courts are not free to substitute their judgment as to the wisdom of a particular administrative action for that of the agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable." Quoting from this Court's earlier opinion in *Flanagan v. Civil Service Dept.*, 29 *N.J.* 1, 12 (1959), he explained that:

If there is *any fair argument* in support of the course taken [by the agency] or *any reasonable ground for difference of opinion* among intelligent and conscientious officials, the decision is conclusively legislative, and will not be disturbed unless patently corrupt, arbitrary or illegal. Doubts held by the court as to the

wisdom of the administrator's decision do not alter the case . . . . [75 *N.J.* at 563; emphasis added]

See also *Consolidation Coal Co. v. Kandle*, 105 *N.J.Super.* 104, 118 (App.Div.1969), aff'd o. b. 54 *N.J.* 11 (1969).

■ This presumption of reasonableness is even stronger here as the agency has been delegated discretion to determine the specialized and technical procedures for its tasks. See *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599 (1965) (in the case of agency review due regard must be given to an agency's expertise where such expertise is a pertinent factor); *Shahmoon Indus., Inc. v. N. J. Dept. of Health*, 93 *N.J.Super.* 272, 282–283 (App.Div.1966), certif. den. 49 *N.J.* 358 (1967) ("where an administrative agency is concerned with technical matters the courts will give weight to its presumed expertise in reviewing its decisions." [citations omitted]).

■ In addition, we note that the mapping directive itself is broadly worded. While *N.J.S.A.* 13:1B–13.3 lists four specific types of source material, it directs the agency to take them "into account", but does not require that any one of them form the basis of the mapping program. Broad discretion is vested in the NRC for it is authorized to use "such other historical or scientific data" which, in its opinion, are relevant. Thus drafted, the statute does not foreclose a program like the NRC's based primarily on vegetation and biological analysis and secondarily on historical sources and existing tidal data, as well as on information obtained from tide gauging and surveying.[2]

■ Moreover, the evidence indicated that the NRC through the OEA had indeed "taken into account" the source material set out in *N.J.S.A.* 13:1B–13.3. Although it was conceded that

[2]With respect to the question of precision, the statute is conspicuously silent. Given the six-month time constraint on the preparation of the maps, it is quite reasonable to read the statute as a mere directive to catalogue the State's claims quickly so they could later be tested in individual quiet title suits.

no new tide gauging was undertaken, the NRC made use of the existing mean high water data of the United States Coast and Geodetic Survey. Its experts contended that no new tide gauging was ordered because of the technical difficulties and inaccuracies inherent in tide gauging in a marsh. In addition, NRC consulted many of the historical sources and considered the impact of numerous artificial changes to which the appellants referred. It exercised its delegated discretion in choosing not to incorporate some historical materials—because they depicted mean low water instead of mean high water or because their lines were drawn for navigational purposes and thus failed to extend into interior meadows. Various artificial changes were considered, but not incorporated, because the effect of man-made alterations was viewed as too speculative absent verifiable historical data. Finally, the nature of the meadowlands vegetation was considered as part of the biological delineation program, a program which was certainly authorized by the statute's broad invitation to have the agency take into account such other scientific data which, in its opinion, were relevant.

With respect to the validity of the biological delineation theory and the quality of the scientific method itself, evidence was adduced suggesting that this spectral reflectance theory, validated by one of appellants' experts and subjected to extensive field analysis for verification, had been confirmed in the biological literature. With respect to the agency's claim of ten-foot parcels beyond the banks of depicted watercourses, in the Newark-Elizabeth meadows, a joint study conducted by the National Ocean Survey and the State demonstrated the similarity between the Tuckerton and Newark-Elizabeth meadows prior to their development.

Thus, the evidence adduced indicates only a difference of opinion between the appellants' and the NRC's experts. Mindful of the presumptive validity of the agency's actions and the fact that no titles are being quieted here, we see no basis for upsetting the factual findings of Judge Trautwein. Where "there is any fair argument in support of the course taken [by

the agency] or any reasonable ground for difference of opinion among intelligent . . . officials, the decision . . . will not be disturbed unless patently corrupt, arbitrary, or illegal." *Flanagan v. Civil Service Dept.*, 29 *N.J.* at 12. Where "a subject is debatable, the agency determination must be upheld," because a court would usurp the legislative body if it attempted to determine the results of the debate. *United Hunters Ass'n of N. J., Inc. v. Adams*, 36 *N.J.* 288, 292 (1962). While the judiciary will interfere where the determination is arbitrary, the record in this case discloses genuinely debatable issues. The Appellate Division's determination that the NRC's maps represent a reasonable implementation of the duty mandated in *N.J.S.A.* 13:1B–13.2 and 13:1B–13.3 is therefore affirmed.

Finally, we note that the impact of these maps is limited. They set forth the State's claims. This is *not* a quiet title suit and these maps are *not* being measured against claims of private ownership in this case. Although the State may seek to introduce these maps as evidence of its sovereign ownership claims in later quiet title suits, the sole issue here concerns whether the maps comply with the guidelines established in Title 13. We cannot and do not find here that the State's claims are legally warranted in whole or in part as against other parties asserting ownership. We do not broach the question of what evidentiary effect these maps should be given in subsequent quiet title suits involving private owners. The question remains open as to whether they will satisfy either the burden of production or persuasion which the State may have in those cases. See *Warner v. Smith*, 115 *N.J.Eq.* 572, 573 (E. & A.1934); *N.J.S.A.* 2A:62–1, 2A:62–2.

## II

■ Appellants also contend that the NRC's maps must be suppressed because the State's title is limited to waterways which are both tidally-flowed and navigable. Appellants rely

for this proposition on *State Land Bd. v. Corvallis Sand and Gravel Co.*, 429 *U.S.* 363, 97 *S.Ct.* 582, 50 *L.Ed.2d* 550 (1977).

The reliance is misplaced. The issue in *Corvallis* concerned the title to land underlying the Willamette River, a navigable stream, in Oregon. Corvallis Sand and Gravel Co. had been digging in the riverbed for 40 or 50 years without the state's permission. Oregon instituted an action in the state courts seeking damages and immediate possession. Each party was partially successful and the Supreme Court granted petitions for *certiorari.* The federal question centered about the title to the riverbed when Oregon became a state, having had a prior territorial status. Subsequent to statehood, the course of the Willamette River had been altered by a severe flood. The Court was faced with the question whether federal or state law governed the effect of the changed course. *Corvallis* held that the delineation of the riverbed at the time of Oregon's admission into the Union would be determined by federal law, but that state law would govern the effect of subsequent changes in the watercourse.

The Supreme Court spoke in terms of navigability as the test for ownership only because it was the navigable character of the watercourse on which the state based its claim of sovereign ownership in *Corvallis.* The Supreme Court did not hold that navigability was prerequisite to sovereign ownership in all cases. Nor did it foreclose the assertion of sovereign ownership on the basis of land being tidally-flowed rather than submerged beneath navigable waters.

When viewed in their proper historical perspective, the navigability and tidal tests are clearly separate criteria. In England, all the " 'land below high-water mark belonged to the British nation, and was vested in the king, as the head thereof, in trust for the public. It was vested by the Revolution in the sovereignty of the state, and [was] held under the guardianship of the Legislature.' " *Bailey v. Driscoll*, 19 *N.J.* 363, 367 (1955), quoting *Ross v. Mayor of Edgewater Borough*, 115 *N.J.L.* 477,

483 (Sup.Ct.1935), aff'd o. b. 116 *N.J.L.* 447 (E. & A.1936), *cert.*
den. 299 *U.S.* 543, 57 *S.Ct.* 37, 81 *L.Ed.* 400 (1936)(citations
omitted). Sovereign ownership was based on tidal flow and the
sovereign had no title to lands beneath non-tidal rivers. In
England, non-tidal watercourses were, with a few small excep-
tions, non-navigable and the public interest in unobstructed
commerce was never threatened by the limiting character of a
tidal test. See *Illinois Central R. Co. v. Illinois,* 146 *U.S.* 387,
436, 13 *S.Ct.* 110, 111, 36 *L.Ed.* 1018, 1036–1037 (1892).

In this country, however, many interior rivers are navigable
but non-tidal, and the interest in unobstructed commerce was
threatened by the possibility of private ownership of these
navigable waters. Thus, in the nineteenth century the United
States Supreme Court saw fit to create a navigability basis for
sovereign ownership separate from the tidal test. See *Barney v.
Keokuk,* 94 *U.S.* 324, 24 *L.Ed.* 224 (1877). In so doing the Court
did not reject the tidal standard as the basis for sovereign
ownership of land beneath tidally-flowed, but non-navigable
waters.

Sovereign ownership based on tidal flow, irrespective of
navigability, has been and continues to be the rule in this State.
See *O'Neill v. State Highway Dept.,* 50 *N.J.* 307, 322–323 (1967);
*McCarter v. Hudson County Water Co.,* 70 *N.J.Eq.* 695, 720 (E. &
A.1906), aff'd 209 *U.S.* 349, 28 *S.Ct.* 529, 52 *L.Ed.* 828 (1908);
*Cobb v. Davenport,* 32 *N.J.L.* 369, 378–380 (Sup.Ct.1867). Judge
Goldmann, in *Schultz v. Wilson,* 44 *N.J.Super.* 591, 603 (App.Div.
1957), certif. den. 24 *N.J.* 546 (1957), after an extensive survey of
the New Jersey law, concluded that "the test to be followed in
determining State sovereignty over submerged lands in New
Jersey is the tidal [and not the navigability] test." We continue
to adhere to that firmly established principle.

## III

Lastly, appellants seek to estop the State from asserting sovereign ownership of the interior portions of the Hackensack and Newark-Elizabeth meadows. They claim that the State has always treated those meadowlands as above the mean high water line, that it did not assert sovereign ownership until the passage of Title 13 and that property owners have relied on the private character of these lands.

We rejected a comparable argument in *O'Neill*. Writing for a unanimous court in that case, Chief Justice Weintraub cautioned that "neither estoppel nor laches is applied against the State to the same extent as against private parties." *O'Neill v. State Highway Dept.*, 50 *N.J.* at 319 (citations omitted). See *Abbott v. Beth Israel Cemetery Ass'n*, 13 *N.J.* 528, 548 (1953). He emphasized that the party seeking the benefit of estoppel has the burden of establishing that an officer of the State, conscious of the State's true interest and aware of the private owner's misapprehension, stood by while the private owner acted in detrimental reliance. *O'Neill v. State Highway Dept.*, 50 *N.J.* at 318. The mere failure of the State "to exercise dominion over its properties or somehow to give public notice of its many holdings" does not operate to divest the State of title. *Id.* at 320. Although the State may well be in a better position than a third person to know the extent of its sovereign ownership, the vast extent of land flowed by the tide and the obvious difficulty inherent in delineating ownership weigh against divestiture by estoppel.

Appellants' proofs are wanting. At most they have shown only a failure of the State to exercise dominion over the lands in question or to give public notice of its properties. Appellants stress the fact that in the State's administration of riparian grants, *N.J.S.A.* 12:3–1 *et seq.*, its maps of available lands seldom depicted areas beyond the banks of well-defined tidal watercourses. However, those maps cannot be said to constitute a disclaimer of title. They merely catalogue lands

available for riparian grants and are not statements of ownership. The statutory dedication of monies received from the sale of "lands belonging to this state now or formerly lying under water" to the support of public schools, *N.J.S.A.* 18A:56–5, and the constitutional prohibition of the use of that money for any other purpose, *N.J.Const.* (1947), Art. VIII, § IV, par. 2, further militate against interpreting the State's cataloguing of riparian grants as a disclaimer of title. In the absence of any showing that a State officer conscious of the State's interest stood by while the private owner acted in reliance thereon, the State's failure to claim tidally-flowed, interior meadowlands until the passage of Title 13 does not support an estoppel.

Affirmed. No costs.

*For affirmance* —Chief Justice WILENTZ and Justices SULLIVAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK —6.

*For reversal* —None.