FAIRLEIGH S. DICKINSON, JR., RAYMOND BATEMAN, INDIVID-
UALLY AND AS GUARDIAN AD LITEM OF MICHAEL BATE-
MAN, WAYNE DUMONT, JEREMIAH O'CONNOR, J. HERBERT
LEVERETT, INDIVIDUALLY AND AS GUARDIAN AD LITEM
OF DWAYNE HERBERT LEVERETT, MARGARET KELLER,
CHARLES ROHDE, PLAINTIFFS, v. THE FUND FOR THE
SUPPORT OF FREE PUBLIC SCHOOLS, DONALD LAN, SEC-
RETARY OF STATE, OF THE STATE OF NEW JERSEY, ACT-
ING AS SECRETARY OF STATE AND AS SECRETARY OF
THE FUND FOR THE SUPPORT OF FREE PUBLIC SCHOOLS
AND DONALD LAN AS TRUSTEE OF THE FUND FOR THE
TIDELANDS RESOURCE COUNCIL, A DIVISION OF THE
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PRO-
TECTION, DEFENDANTS.

Superior Court of New Jersey
Law Division Bergen County

Decided July 8, 1982.

*E. Carter Corriston, Terry Paul Bottinelli* and *Brian T. Campion* for plaintiffs (*Breslin & Breslin,* attorneys).

*William Harla,* Deputy Attorney General for defendants (*Irwin I. Kimmelman,* Attorney General of New Jersey).

SIMPSON, A.J.S.C.

This case involves the validity and interpretation of an amendment to the New Jersey Constitution approved by the voters, by a vote of 864,445 in favor and 756,220 opposed, on November 3, 1981. The amendment, *N.J. Const.* (1947), Art. VIII, § 5, par. 1, provides:

> No lands that were formerly tidal flowed, but which have not been tidal flowed at any time for a period of 40 years, shall be deemed riparian lands, or lands subject to a riparian claim, and the passage of that period shall be a good and sufficient bar to any such claim, unless during that period the State has specifically defined and asserted such a claim pursuant to law. This section shall apply to lands which have not been tidal flowed at any time during the 40 years immediately preceding adoption of this amendment with respect to any claim not specifically defined and asserted by the State within 1 year of the adoption of this amendment.

As a result of litigation reported in *Gormley v. Lan,* 181 *N.J.Super.* 7 (App.Div.1981), *aff'd* 88 *N.J.* 26 (1981), and pursuant to *N.J.S.A.* 19:3–6, the public question and amendment were accompanied on the ballot by the following interpretive statement:

The primary purpose of this amendment is to relieve owners of land from certain competing claims of ownership by the State. These claims arise from the fact that the State may own any land that ever had the ordinary high tide ("mean" high tide) flow over it, regardless of who the record owner may be or how long he has occupied the land. Sometimes it is difficult to determine that fact and owners may be uncertain for years if the State has a claim to the land.

When the State establishes ownership of tidal flowed land, any proceeds from the sale of the land are deposited in a fund devoted to public education.

This amendment provides that if the State does not, within one year, present all claims on lands that have been "dry" for at least 40 years, those claims are barred. The State may have claims for such land that would succeed under present law but that may be extinguished by virtue of this amendment, if for any reason the State does not assert such claims within that one year.

Prior to the election plaintiffs commenced this action challenging the validity of the then proposed amendment and seeking to enjoin the publication and processing of the referendum question. Injunctive relief was denied and there was no appeal therefrom. Since the amendment was approved, plaintiffs proceeded to trial, challenging the validity thereof on state and federal constitutional grounds and alternatively seeking relief in the nature of *mandamus* to compel the "expeditious" mapping and approval of maps of all tidelands areas. Discovery, briefing and the trial were expedited since the heart of the controversy concerns the one-year deadline (or November 2, 1982) by which time the State must have "specifically defined and asserted . . . pursuant to law" all claims to riparian lands not tide-flowed for 40 years. As the interpretive statement to the amendment, drafted by the New Jersey Supreme Court [1], indicates, claims for such lands may be extinguished if the State does not "present" or "assert" them within the one-year period. The operative facts needed to dispose of this case are not in dispute and are determined from extensive stipulations, exhibits marked into evidence without objection, the uncontroverted testimony of Roland S. Yunghans and some findings following the assertion of propositions of fact and their contradictories.

---

[1] *Gormley v. Lan, supra,* 88 *N.J.* at 35, n. 2 (1981).

## I. Background

The history of state ownership of riparian or tide-flowed lands was reviewed by Judge Goldmann in *Schultz v. Wilson*, 44 *N.J.Super.* 591 (App.Div.1957). In *O'Neill v. State Hwy. Dept.*, 50 *N.J.* 307 (1967), the New Jersey Supreme Court held that the State owns in fee simple all lands flowed by the tide up to the mean high water line, and such title cannot be lost by estoppel, adverse possession or prescription. In this same opinion Chief Justice Weintraub said that as a matter of good housekeeping the State should do what is "feasible" to catalog its tidelands' holdings, but noted the difficulties involved. In response thereto, as noted by Justice Schreiber in *Newark v. Natural Resource Council, etc.*, 82 *N.J.* 530, 534 (1980), *cert.* den. 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.2d* 245 (1980), the Legislature directed title studies and surveys of the State's meadowlands to determine what portions were state-owned.[2]

*N.J.S.A.* 13:1B–13.2 set priorities for the work, with the Hackensack Meadowlands to be the first survey, and subsequent sections of *L.* 1968, *c.* 404, specified methods and procedures for certification of state-owned lands and publication of maps "clearly indicating" state-owned lands. The Supreme Court's opinion in the *Newark* case was issued May 15, 1980; thus, it was not until that date that the extremely complex tidal-mapping programs and procedures received final approval against legal sufficiency and reasonableness challenges. Using current statutory titles, the mapping and conveyancing procedures as to tidelands may be summarized as follows:

1. Preparation of maps by the Office of Environmental Analysis (O.E.A.) of the Department of Environmental Protection (*N.J.S.A.* 13:1D–1 *et seq.*).

2. Approval and publication of maps, pursuant to *N.J.S.A.* 13:1B–13.4 by the Tidelands Resource Council (T.R.C.).

---

2*L.* 1968, *c.* 404, § 87 *et seq.*, codified as *N.J.S.A.* 13:1B–13.1 *et seq.*

3. Review by the T.R.C. of objections by aggrieved persons as to title, pursuant to *N.J.S.A.* 13:1B–13.5(a).

4. Aggrieved persons alternatively may immediately commence quiet title actions pursuant to *N.J.S.A.* 13:1B–13.5(b).

5. T.R.C. review of applications for riparian conveyances and recommendations, pursuant to *N.J.S.A.* 13:1B–13.8 and 13.9.

6. Approval of riparian leases and grants by the T.R.C., Commissioner of Environmental Protection, and the Governor, pursuant to *N.J.S.A.* 13:1B–13.

7. Payment of the net proceeds of all sales and leases of riparian lands to the Fund for the Support of Free Public Schools (hereinafter the "Fund") pursuant to *N.J.S.A.* 13:1B–13.13.

The status of the Fund was summarized in *Garrett v. State,* 118 *N.J.Super.* 594 (Ch.Div.1972), as follows:

> Under both the *Constitution* of 1844, Art. IV, § VII, par. 6, and the *Constitution* of 1947, Art. VIII, § IV, par. 2, the Fund for the Support of Free Public Schools and all money, stock, and other property appropriated for that purpose has been declared to be a perpetual fund. [at 599]

*N.J.S.A.* 18A:56–5 provides, with the last sentence added by *L.* 1980, *c.* 72, § 3, eff. July 16, 1980:

> All lands belonging to this State now or formerly lying under water are dedicated to the support of public schools. All moneys hereafter received from the sales of such lands shall be paid to the board of trustees, and shall constitute a part of the permanent school fund of this State. To the extent that moneys received from the sales of these lands may, by law, be made payable to any purposes other than the school fund, these moneys shall not be paid to other purposes so long as there is a deficiency in the school bond reserve.

The second sentence of Art. VIII, § IV, par. 2, of the 1947 Constitution authorized the Fund to invest in school district bonds and also to secure school bonds as the Legislature may provide. The Legislature, by *N.J.S.A.* 18A:56–17 *et seq.,* has provided a school bond reserve within the Fund of at least 1½%, generally, of aggregate school district bonded indebtedness in the State.

## II. *Mapping Progress*

From the stipulations, and uncontroverted testimony of Roland S. Yungans, Chief of the O.E.A. in the Department of Environmental Protection, I find the following significant facts:

1. O.E.A. is responsible for mapping for the T.R.C. the State's claims to all lands now or formerly flowed by mean high tide.

2. Following suppression of the so-called "Gray and White" map [3], O.E.A. developed a four-part methodology to map the State's claims using (a) old maps, (b) aerial photography, (c) tidal data and (d) some surveys—which was approved by the Supreme Court for *N.J.S.A.* 13:1B–13.2 and 13.3 purposes on May 15, 1980. [4]

3. An accelerated tidelands delineation program, whereby the cataloging of all the State's tidelands will be completed by O.E.A. by December 31, 1985, has been in effect since approval in June 1978 by then Commissioner of Environmental Protection (now Justice) O'Hern. This was the most efficient and cost-effective of four proposals and also had the shortest program length.

4. Further increased funding and staffing for O.E.A. would not advance the December 31, 1985 completion date for the full state tidelands delineation program because of:

A. The time needed to train technical and professional staff.

B. The sequential nature of the 23-step, 20-week map production process.

C. Field work limitations due to weather and seasonal dependencies (*e.g.,* rain and wind mask tidal effects, high tides reach mean high water only 12 days a month, tides are suppressed in the winter, ice and snow inhibit field work).

D. The impossibility of completing certain "head of tide" information, required prior to claim delineation, before December 1982—needed for map production in the Tidal Delaware region of the State.

---

[3] *Newark v. Natural Resources Council, etc., supra* 82 *N.J.* at 537.

[4] *Id.* at 540 and 546.

5. Of the 21 counties in New Jersey, all except Hunterdon, Morris, Sussex and Warren are subject to investigation for potential claims to lands now or formerly below mean high water. The areas subject to investigation are depicted on 1,632 base photomaps covering 2,452 square miles, or 29.9%, of the total land and water area of the State (8,204 square miles). A preliminary estimate is that the State's claims will not exceed 15% (367 square miles) of the total area subject to tidelands claim investigations. Exhibit P–13 pictorially depicts the areas and 1,632 maps as squares or rectangles—each equivalent to 1.5025 square miles (or 964.2 acres).

6. Exhibit P–13 also divides the potential claims portions of the State into zones lettered "A" through "R," which indicate areas of similar tidal characteristics (and particularly with regard to the times of predicted high tides). Some of the squares are fully colored in brown, yellow, dark blue, red, green and light blue—reflecting maps delivered to the T.R.C. or completed at the O.E.A. and in the process of final preparation for delivery to the T.R.C. The colors reflect completion in fiscal years 1979 through 1982, except for the Hackensack and Newark-Elizabeth areas completed at earlier dates. The order of completion of the maps was based upon the availability of required information to proceed with the delineation process. The uncolored squares represent areas to be delineated for tidelands claims except those with "X" marks in them. Where an "X" appears in a square it represents uplands not subject to riparian claims. There is an exception to this code in that squares with "X" marks in zones "G" and "H" represent lands covered by open water and obviously all riparian.

7. Generally, P–13 reflects planned tidelands delineation by the November 2, 1982 deadline of most of what may be called the Atlantic Coastal areas and nondelineation of the Tidal Delaware region. After O.E.A. completes a map it goes to a contractor for "scribing." This takes four to six weeks and results in a plastic overlay to the map which contains lines separating the State's riparian claims from the upland. Finally,

O.E.A. prepares a Claims Overlay Preparation Summary or "C.O.P.S." which lists all sources of the investigation for a particular map.

8. As already noted, the Tidal Delaware region shown on P–13 that will not be fully delineated by November 2, 1982 cannot be further expedited because "head of tide" information will not be available until December 1982. The interior of Zone "K", which is Atlantic County, will not be completed by the deadline either. Generally, the Atlantic coastal areas yield more riparian claims that would be affected by the amendment than the Tidal Delaware region. In other words, there is more "former scene" land (now dry, but formerly tide-flowed) on the Atlantic coast (zones "A" through "M") and more "present scene" land (now tide-flowed) in the Tidal Delaware region.

9. Of the 1,632 base photomaps, a total of 54 had been adopted by the T.R.C. prior to June 9, 1982—being 53 of the Hackensack and Newark-Elizabeth areas and one called the Bogota map. On June 9, 1982 the T.R.C. adopted 713 maps that had been prepared by O.E.A. and forwarded under the accelerated tidelands delineation program since June 13, 1979. Approximately 100 more maps will be available for T.R.C. adoption by November 2, 1982, so that about 700 (Tidal Delaware region in zones "N" through "R", plus interior portion of Atlantic County zone "K", less those shown on P–13 with "X" marks and representing uplands) will not have been delineated before the deadline. This represents about 47% of the area subject to investigation—which could be completed by December 31, 1985.

10. Until the O.E.A. transmits maps to the T.R.C. they are not public knowledge, and P–13 was also an in-house O.E.A. product at least until marked in evidence in the present case.

### III. *Constitutional Challenges*

There are two basic reasons why plaintiffs challenge the validity of the amendment. First, the impossibility of fully delineating all tidelands claims—in the sense of O.E.A. mapping and T.R.C. action pursuant to *N.J.S.A.* 13:1B–13 *et seq.* as set

forth above—by November 2, 1982, with a resultant difference of treatment of owners of lands subject to state claims. One of the plaintiffs is a property owner of former scene lands who has paid compensation to the State for riparian lands not tide-flowed for 40 years. If the amendment is interpreted to require compliance with *N.J.S.A.* 13:1B–13 *et seq.* by November 2, 1982, the owners of former scene lands in the 47% of the area subject to investigation for possible state claims will be treated differently than the owners of such lands in the other 53%—in effect receiving fee simple titles without being subject to compensating the State as are the others. Second, the result of such an interpretation of the amendment would reduce the Fund and the school bond reserve within the Fund because the value of sales and leases of such riparian lands within the 47% of the area subject to investigation could never be collected. Other plaintiffs qualify as affected citizens, taxpayers, teachers, students and owners of school bonds—all asserting standing to raise the issues of validity of the constitutional amendment.

Except for the status of one of the plaintiffs as a bondholder, defendants do not challenge the standing of plaintiffs to assert the invalidity of the constitutional amendment. Since federal constitutional issues are implicated, it is appropriate to briefly consider the subject. *Bonnet v. State,* 141 *N.J.Super.* 177, 198 (Law Div.1976). New Jersey has a liberal approach to standing, and although avoiding the complexities and technicalities enmeshing such question in the federal courts, does confine cases "to those situations where the litigant's concern with the subject matter evidenced a sufficient stake and real adverseness." *Crescent Pk. Tenants Ass'n v. Realty Eq. Corp. of N.Y.,* 58 *N.J.* 98, 107 (1971). In this case it has been estimated that thousands of titles involving millions of dollars may be affected by the amendment. Since the proceeds of riparian land sales and leases go to the Fund, which has an impact on public education and taxation therefor, virtually every person in the State is affected in one way or another. Both sides of all issues involve the public interest; hence, the

Attorney General is in a virtually impossible position. Indeed, the former Attorney General in 1981 opposed the amendment while the present Attorney General in 1982 defends it. Accordingly, plaintiffs have standing to raise all issues before this court.

There are three separate bases for challenging the validity of the amendment, and these which may be called the trust issue, the equal protection issue and the impairment of contracts issue.

### A. Trust Issue

Art. VIII, § IV, par. 2, of the New Jersey Constitution of 1947 provides that:

> The fund for the support of free public schools, and all money, stock and other property, which may hereafter be appropriated for that purpose, or received into the treasury under the provisions of any law heretofore passed to augment the said fund, shall be securely invested, and remain a perpetual fund; and the income thereof, except so much as it may be judged expedient to apply to an increase of the capital, shall be annually appropriated to the support of free public schools, and for the equal benefit of all the people of the State; and it shall not be competent, except as hereinafter provided, for the Legislature to borrow, appropriate or use the said fund or any part thereof for any other purpose, under any pretense whatever. The bonds of any school district of this State, issued according to law, shall be proper and secure investments for the said fund and, in addition, said fund, including the income therefrom and any other moneys duly appropriated to the support of free public schools may be used in such manner as the Legislature may provide by law to secure the payment of the principal of or interest on bonds or notes issued for school purposes by counties, municipalities or school districts or for the payment or purchase of any such bonds or notes or any claims for interest thereon.

In a formal opinion [5] the Attorney General noted the relationship of this constitutional provision and N.J.S.A. 18A:56–5 hereinabove cited in full:

> Article VIII, § 4, par. 2 of the Constitution of 1947 establishes a permanent school fund for the equal benefit of all the people of this State. In so doing, the Constitution provides a mechanism whereby the legislature "may" appropriate "money, stock and other property" to that fund. However, the Constitution also establishes that, once appropriated, such "money, stock and other property" is irrevocably dedicated to the school fund. The language of Article VIII is unequivocal; the fund for the support of free public schools is to be "perpetual" and may not be violated "for any other purpose, under any pretense whatever."

---

[5] 8 Op.Atty.Gen. 2, 1978.

The dedication of State-owned lands "now or formerly lying under water" to the permanent school fund by the State legislature (N.J.S.A. 18A:56–5) fulfills the mandate of Article VIII. Thus, the constitutional provision, in conjunction with the legislative enactment, "identifies the fund therein referred to" and operates to protect the fund, both capital and income derived therefrom, "against trespass by the legislature." *Everson v. Board of Education,* 133 N.J.L. 350, 352, 353 (E. & A. 1945), aff'd 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946); see *State v. Rutherford,* 98 N.J.L. 465, 466, 467 (E. & A. 1923). Together, Article VIII and N.J.S.A. 18A:56–5 prevent the removal of riparian lands from the school fund and impose limits on the use of such lands in order that the fund may not be impaired. [Footnotes omitted; emphasis supplied]

Plaintiffs also point to language describing riparian lands as "property held in trust," *Schultz v. Wilson, supra* at 605, and as "trust assets," *Newark v. National Resource Council, etc.,* 133 *N.J.Super.* 245, 250 (Law Div.1975), aff'd 148 *N.J.Super.* 297 (App.Div.1977), aff'd 82 *N.J.* 530 (1980), *cert.* den. 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980), in support of their argument that riparian lands are irrevocably dedicated to a perpetual trust fund. Various principles of the law of private trusts are relied upon to support the contention that the trustees of the Fund cannot be divested of their "equitable title" to the riparian lands irrevocably dedicated to the Fund. The Fund, of course, is public in nature rather than private. No authority is cited for the proposition that the people of New Jersey are somehow bound in perpetuity and can never change such a state of affairs.[6] Although it will not be necessary to decide such a formidable constitutional question to dispose of this case, as will subsequently be seen, no reason appears why the people of this State cannot in effect partially modify Article VIII, § 4, par. 2, of their 1947 Constitution by Art. VIII, § 5, par. 1. The effect of the amendment is to create a time bar akin to a statute of limitations rather than to divest the Fund of any riparian lands.

---

[6]In his farewell address of September 19, 1776, President George Washington aptly noted: "The basis of our political system is the right of the people to make and to alter their Constitutions of Government." See, *The Washington Papers,* at 315 (1955).

## B. *Equal Protection Issue*

 Because of the impossibility of completion of the full accelerated tidelands delineation program before December 31, 1985, plaintiffs assert a denial of equal protection of the laws violative of the Fourteenth Amendment to the United States Constitution.[7] State constitutional provisions as well as state statutes are subject to the Supremacy Clause and rights guaranteed under the Federal Constitution. *Reynolds v. Sims,* 377 *U.S.* 533, 84 *S.Ct.* 1362, 12 *L.Ed.2d* 506 (1964), reh. den. 379 *U.S.* 870, 85 *S.Ct.* 12, 13 *L.Ed.2d* 76 (1964). The tests for equal protection claims are complex, *U.S. Chamber of Commerce v. State,* 89 *N.J.* 131 (1982); *Levine v. Institutions & Agencies Dep't,* 84 *N.J.* 234, 256–257 (1980), but even a statutory discrimination will not be set aside if any state of facts may reasonably be conceived to justify it. *McGowan v. Maryland,* 366 *U.S.* 420, 427, 81 *S.Ct.* 1101, 1105, 6 *L.Ed.2d* 393, 400 (1961); *Paul Kimball Hosp. v. Brick Tp. Hosp.,* 86 *N.J.* 429, 441 (1981). At least as liberal a standard is applicable to the present situation involving a constitutional amendment placed upon the ballot following legislative hearings that identified problems such as the need to quiet titles, facilitate development hampered by clouded titles, and settle uncertainty created by over 300 years of potential state claims to unidentified riparian lands.[8] Even under the "strict scrutiny" test summarized in *U.S. Chamber of Commerce, supra,* applicable to "fundamental rights" or "suspect classes" of equal protection claims, the constitutional amendment would likely pass federal constitutional muster. There appears to be a "compelling need" justifying a time limitation on riparian claims and no "less restrictive alternative" than a time bar would accomplish such state objective. The one-year period, of course,

---

[7] *U.S.* Const. Amend. XIV, § 1.

[8] The records of the legislative hearings held June 5 and July 23, 1981 were marked in evidence as exhibits P–11 and P–12, respectively. They were also cited in *Gormley v. Lan, supra,* 88 *N.J.* at 30–32.

is debatable—but this will subsequently be seen to be of no moment, when the meaning of the words of the amendment "specifically defined and asserted such a claim pursuant to law" is addressed.

## C. *Impairment of Contracts Issue*

Article VIII, § IV, par. 2, of the 1947 Constitution, cited above, authorized the Legislature to secure the payment of school bonds principal and interest by Fund principal and interest. By *L.* 1980, *c.* 72, § 5, eff. July 16, 1980,[9] the Legislature exercised this authority. The first paragraph of this section of the New Jersey School Bond Reserve Act [10] provides:

> There is established within the fund for the support of free public schools a school bond reserve in an amount equal to at least 1½% of the aggregate issued and outstanding bonded indebtedness of counties, municipalities or school districts for school purposes, exclusive of bonds the debt service for which is provided by State appropriations but not to exceed the moneys available in the fund. The school bond reserve shall be composed entirely of direct obligations of the United States Government or obligations guaranteed by the full faith and credit of the United States Government.

It was stipulated that on June 30, 1981 the 1½% reserve required to secure outstanding and unpaid bonded school indebtedness was $17,172,042 and that the unreserved balance of the Fund was $18,738,395.17. There was evidence, although somewhat speculative, that future school capital program needs would require bonded indebtedness that in turn would require a 1½% reserve in excess of the entire Fund. The statute of course, limits the reserve to an amount "not to exceed the moneys available in the Fund." Plaintiffs contend that the amendment violates the Contract Clause of the U.S. Constitution [11] because the Fund will lose proceeds of riparian land

---

[9]Codified as *N.J.S.A.* 18A:56–19.

[10]*N.J.S.A.* 18A:56–17 *et seq.*

[11]*U.S.* Const. Art. 1, § 10, which provides in pertinent part that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

claims barred after November 2, 1982. The shrinkage of the Fund below the amount needed to provide the 1½% reserve is said to impair the obligations to holders of school bonds who purchase them with presumed reliance upon such security. There were proofs that following passage of the New Jersey School Bond Reserve Act the ratings of school bond issues were raised by Standard & Poor's but not by Moody's.

■ The standing of plaintiffs to raise this issue is doubtful. The only plaintiff to own a school bond purchased it in May 1982—after adoption of the amendment and obviously with full knowledge of any adverse effect of the amendment upon the security or insurance feature of the reserve fund. *Crescent Park Tenants Ass'n v. Realty Eq. Corp. of N.Y., supra.* In addition, purchasers of bonds before the July 16, 1980 effective date of the New Jersey School Bond Reserve Act could not have relied upon any added security from the reserve fund. Even assuming standing in view of the broad public interest in public school financing, plaintiffs' challenge is not persuasive. The Contract Clause is not absolute. Impairment may be justified by a state's authority to safeguard the vital interests of its people. *Home B. & L. Assn. v. Blaisdell,* 290 *U.S.* 398, 54 *S.Ct.* 231, 78 *L.Ed.* 413 (1934). And, as noted in *U.S. Trust of N.Y. v. New Jersey,* 431 *U.S.* 1, 97 *S.Ct.* 1505, 1519, 52 *L.Ed.2d* 92 (1977):

> The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations (footnote citing *El Paso v. Simmons,* 379 *U.S.* 497, 85 *S.Ct.* 577, 13 *L.Ed.2d* 446 (1965) and earlier cases omitted). As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. [at 26]

Plaintiffs rely on the *U.S. Trust* decision, of course, since it invalidated a New Jersey statute, and seek to distinguish the *El Paso* decision upholding a Texas statute—both cases involving state action challenged as violative of the Contract Clause. Although *El Paso* seems to be closest to the situation in the present action, no useful purpose will be served by a detailed review of those situations and opinions because a New Jersey constitutional amendment is involved here and the interpreta-

tion thereof will preclude even a *de minimis* impairment of the obligations of school bonds issued between July 16, 1980 and November 3, 1981.

### D. *Summary*

Although the trust, equal protection and impairment of contract challenges to the validity of the constitutional amendment are doubtful, there is really no need to decide same. As Chief Justice Weintraub noted in a different context in *State v. Salerno*, 27 *N.J.* 289, 296 (1958):

> The constitutional issues are formidable. Ordinarily we should not undertake to resolve a constitutional challenge if the litigation may be disposed of without reaching the fundamental issue . . . .

The principle that constitutional questions will not be decided unless absolutely necessary is settled as to both federal and state constitutional matters. *Hagans v. Levine*, 415 *U.S.* 528, 529, 94 *S.Ct.* 1372, 1375, 39 *L.Ed.*2d 577 (1974); *Rescue Army v. Municipal Court*, 331 *U.S.* 549, 67 *S.Ct.* 1409, 91 *L.Ed.* 1666 (1947); *Donadio v. Cunningham*, 58 *N.J.* 309 (1971); *State v. Salerno, supra.* It is therefore appropriate to examine the words of the amendment in the light of applicable principles of interpretation, to see whether the meaning thereof makes it unnecessary to consider questions as to validity in the light of the U.S. Constitution.

### IV. *The Amendment*

Plaintiffs and defendants seem to agree that the words of the amendment, "specifically defined and asserted such a claim pursuant to law," mean compliance with *N.J.S.A.* 13:1B–13.4, including full O.E.A. mapping as above described and approved in *Newark v. Natural Resources Council, etc., supra,* for *N.J.S.A.* 13:1B–13.2 and 13.3 purposes, together with T.R.C. approval and publication of such maps. The problem with such an interpretation is the absolute impossibility of completion of such mapping by the November 2, 1982 deadline. If that is the correct interpretation, the inevitable result is the barring of some claims as to former scene lands, different treatment of the occupants of

such tidelands in that some will have to compensate the State and others will not, and the possibility that the amendment is invalid because of conflict with the U.S. Constitution. If the amendment is invalid, the remedial purposes thereof, to wit, quieting of titles and settling of uncertainty as to potential state claims to riparian lands, will have been frustrated. No such difficult choice is required; the true meaning of the words of the amendment permit attainment of both objectives of the Legislature in placing the question on the November 3, 1981 ballot and the voters in approving same.

The majority and dissenting opinions in *Vreeland v. Byrne,* 72 *N.J.* 292 (1977), cite many relevant authorities and provide guidance for determining the meaning of the crucial clause of the amendment. In addition, reference to the history, text and structure of the amendment is necessary in the classical sense of constitutional interpretation. The amendment need not be classified as a "great ordinance" as distinguished in *Vreeland* from less exalted constitutional provisions, since the words, "specifically defined and asserted such a claim pursuant to law," are inherently ambiguous, literal adherence is impossible without interpretation and the spirit, intent and purpose of the amendment must be sought and applied. Accordingly, the "plain meaning" rule is inapplicable and the true intent and purpose of the legislative framers and the people must be sought. Analogous also is the judicial duty to strain to uphold a statute to meet constitutional requirements. At least as high a duty falls upon the judiciary to uphold a state constitutional provision or amendment in the face of a federal constitutional challenge. Dictionary definitions cannot be relied upon to frustrate the will of the Legislature and the people. A good sense application rather than adherence to a literal interpretation of the words used is the polestar to avoid an absurd result unintended by the Legislators or the people.

In the light of this general guidance, the key clause or phrase of the amendment raises three questions: what is meant by (A) "specifically defined," (B) "asserted" and (C) "pursuant to law"?

### A. *"Specifically Defined"*

The only available legislative history concerning the amendment is the record of the two public hearings held on June 5 and July 23, 1981.[12] From this record it is clear that the First Assistant Attorney General attempted to convince the sponsoring senators and assemblymen that full tidelands delineation could not be completed by November 2, 1982. She was speaking with reference to the *N.J.S.A.* 13:1B–13 *et seq.* mapping and T.R.C. action procedures, however, and it nowhere appears that this would be required to satisfy the "specifically defined and asserted" criteria of the amendment. While no definition of this terminology appears anywhere in the record, the legislators were really concerned with expediting the initial public notice of all possible riparian claims. Everyone was aware, to be sure, that such notice would not resolve title controversies—nor, for that matter, would full delineation mapping and publication pursuant to *N.J.S.A.* 13, as noted in *Newark v. Natural Resource Council, etc., supra,* 82 *N.J.* at 542. It was also suggested at the July 23, 1981 hearing [13] that release of the 1,632 base photomaps to the public might be sufficient. At this same hearing the absence of Mr. Yunghans was noted, along with an observation that other witnesses had not fully clarified matters.[14] Roland S. Yunghans was in court, of course, and his testimony and the stipulations provide the solution to the dilemma.

The words "specifically defined" in the amendment need not necessarily be equated to mapping, as required by *N.J.S.A.* 13:1B–13.4, since that statute uses the terminology "clearly indicating those lands . . . as State-owned lands." The amendment could have required metes and bounds descriptions, but it did not. It could have been referenced to *N.J.S.A.* 13:1B–13.4

---

[12]See n. 8, *supra.*

[13]Hearings on Assembly Concurr. Resolu. 3037 before the subcommittee of the Assembly Agriculture and Environment Committee, 10 (1981).

[14]*Id.* at 35.

directly or by use of the words "clearly indicating", but it was not. It could have had additional phraseology such as "in such manner as the Legislature may provide," as in Art. VIII, § IV, par. 2, of the Constitution of 1947, but that is not the case either.

■ Accordingly, the legislators and the people must be understood to mean, by "specifically defined," something other than the complete mapping and delineation procedure under *N.J.S.A.* 13:1B–13.4 because that was impossible of accomplishment by November 2, 1982. At the same time, they obviously meant the maximum possible notice as to riparian claims, which can be accomplished by the release of P–13 in evidence and the base photomaps reflecting possible riparian claims areas where *N.J.S.A.* 13:1B–13.4 action will not have been completed by the deadline. Some temporary inconvenience to occupiers of former scene lands in zones "N" through "R" plus the interior portion of the zone "K" will doubtless result—but full delineation will be completed by December 31, 1985 and discrimination against all other property owners will be avoided.

### B. *"Asserted"*

Determination of what is meant in the amendment by the word "asserted" is similar to the inquiry as to the words "specifically defined." The testimony of one or more of the witnesses at the legislative hearings may have assumed that full mapping and publication under *N.J.S.A.* 13:1B–13.4 would be required, but the words of the amendment were not discussed at all. Nor does the term "asserted" appear in that statute. This statute and *N.J.S.A.* 13:1B–13.5 refer to "publish"(ing) maps, "filing" same, "issue"(ing) statements or quitclaim deeds, and "reaffirm"(ing) property as State-owned. The interpretive statement to the public question [15] used the term "assert" in the last sentence thereof, but in the penultimate sentence the verb "present" was used.

---

[15]See n. 1, *supra.*

In the absence of any different meaning derived from the history, text or structure of the amendment, the interpretation mus̆t complement that accorded the words "specifically defined" —in other words, that which is possible by November 2, 1982, helpful to persons occupying lands subject to riparian claims and yet nondiscriminatory as to others who have paid for leases or grants or who are subject to claims by virtue of *N.J.S.A.* 13:1B–13.4 action. The legislators and the people are therefore understood to have meant assertion no later than November 2, 1982 by way of public release of P–13 in evidence, together with the base photomaps (excluding those reflecting only uplands) or such number of them as will not have then been scribed, accompanied by C.O.P.S., and published by the T.R.C. pursuant to *N.J.S.A.* 13:1B–13.4.

### C. *"Pursuant to Law"*

Although these words are nowhere defined, and the legislative history does not discuss them, the structure of the Constitution, as amended, leaves no doubt that the reference is to judicial determination as well as statutory law.

The proceeds of sales of riparian lands are deposited in the Fund provided for in Art. VIII, § IV, par. 2, of the 1947 Constitution. This article also enables the Legislature to provide for Fund investment in, and security for, school bonds. The Legislature has exercised this authority, as previously noted, by passage of the New Jersey School Bond Reserve Act. If the present amendment had intended to merely enable the Legislature to act, it would have been worded "specifically defined and asserted such a claim as the Legislature may provide by law" using terminology similar to that of Art. VIII, § IV, par. 2.

### V. *Mandamus*

In addition to challenging the validity of the amendment, plaintiffs alternatively requested relief in the nature of *mandamus* to compel the T.R.C. to expeditiously map and approve maps of all riparian lands prior to November 3, 1982. The

amendment, as interpreted, is valid. To the extent the request concerns the full tidelands delineation program activities by the O.E.A., it is moot, since the proofs are clear that the O.E.A. is proceeding as expeditiously as possible and it is impossible to complete by November 3, 1982 the entire State, including all photomaps with scribed overlays and C.O.P.S. *Mandamus* is also denied to the extent it is requested to require T.R.C. action under *N.J.S.A.* 13:1B–13.4. This extraordinary remedy will lie to compel a ministerial act, or the mere exercise of a discretionary function—but not the mode or manner of the exercise of discretion. *Switz v. Middletown Tp.*, 23 *N.J.* 580, 587–590 (1957). As of June 9, 1982 the T.R.C. had adopted and published all maps forwarded by O.E.A.

## VI. *Summary and Order*

As interpreted, the Art. VIII, § 5, par. 1, amendment to the 1947 Constitution of New Jersey has been held to be valid. To preclude possible invalidity due to conflict with the U.S. Constitution, all riparian claims as to former scene lands must be specifically defined and asserted by November 2, 1982. All possible claims are in areas located within and reflected on 1,632 base photomaps (less those shown on P–13 as squares with "X" marks that reflect only uplands). Claims have to date been fully delineated as to areas covered by 767 photomaps. All remaining claims will have been specifically defined and asserted pursuant to law by November 2, 1982 and fully delineated by December 31, 1985 by the following actions which are hereby ordered:

1. On or before November 2, 1982 the T.R.C. will file a copy of P–13 with the Secretary of State, together with a copy of each base photomap (excluding those reflecting only uplands) that has not previously been filed with a scribed overlay and C.O.P.S. in accordance with *N.J.S.A.* 13:1B–13.4.

2. Concurrent with such filing, the T.R.C. will send copies of P–13 and the respective base photomaps to the clerks of the

counties and governing bodies of the municipalities whose political boundaries include lands shown on such maps—paralleling the distribution of published maps under *N.J.S.A.* 13:1B–13.4.

3. The action taken pursuant to paragraphs 1 and 2 above shall constitute compliance with Art. VIII, § 5, par. 1, of the 1947 Constitution of New Jersey, as amended, to specifically define and assert claims of the State, pursuant to law, as to lands formerly tide-flowed but not tidal flowed for 40 years prior to the amendment—and within the one-year period provided in such amendment.

4. Notwithstanding the foregoing, all mapping, scribing, and C.O.P.S. preparation must be completed and T.R.C. action taken in accordance with *N.J.S.A.* 13:1B–13.4 as to such claims no later than December 31, 1985.