NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.  A-0065-13T1
             A-3947-13T2

WILLIAM W. LISOWSKI and
CLARA E. LISOWSKI,

    Plaintiffs-Respondents,

v.

BOROUGH OF AVALON,

    Defendant-Respondent,

and

STATE OF NEW JERSEY TIDELANDS
RESOURCE COUNCIL,

    Defendant-Appellant.
_____

STATE OF NEW JERSEY,
DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

    Plaintiff-Respondent,

v.

TOWNSHIP OF DELANCO,

    Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **September 9, 2015** |
| **APPELLATE DIVISION** |

        Argued  March  16,  2015  in  A-0065-13  and
        February 23, 2015 in A-3947-13 —
        Decided September 9, 2015

Before Judges Lihotz, Espinosa and St. John.

On appeal from Superior Court of New Jersey, Chancery Division, Cape May County, Docket No. C-0058-11 in A-0065-13.

On appeal from Superior Court of New Jersey, Chancery Division, Burlington County, Docket No. C-0044-12 in A-3947-13.

Melissa P. Abatemarco and John R. Renella, Deputy Attorneys General, argued the cause for appellant in A-0065-13 (John J. Hoffman, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ms. Abatemarco and Nicolas G. Seminoff, Deputy Attorney General, on the briefs).

Douglas L. Heinold argued the cause for appellant in A-3947-13 (Raymond, Coleman, Heinold & Norman, LLP, attorneys; Mr. Heinold and Stephen E. Raymond, of counsel and on the brief).

Richard M. Hluchan argued the cause for respondents William W. and Clara E. Lisowski in A-0065-13 (Hyland Levin, LLP, attorneys; Mr. Hluchan, of counsel; David G. Gunther, on the brief).

Neil Yoskin argued the cause for respondent Borough of Avalon in A-0065-13 (Sokol, Behot & Fiorenzo, attorneys; Mr. Yoskin, on the brief).

Mark A. Collier and Jennifer L. Dalia, Deputy Attorneys General, argued the cause for respondent in A-3947-13 (John J. Hoffman, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Mr. Collier and Ms. Dalia, on the brief).

2

Edward C. Eastman, Jr., argued the cause for amicus curiae New Jersey Land Title Association in A-0065-13 (Davison, Eastman & Munoz, P.A., attorneys; Mr. Eastman and Michael J. Fasano, on the brief).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

These appeals, which we have consolidated for decision in a single opinion, challenge the sufficiency of the State's effort to delineate and assert its claims to certain tideland property within the time restriction established by the 1981 amendment to the New Jersey Constitution, N.J. Const. art. VIII, § 5, ¶ I (the Amendment). The Amendment applies to "lands that were formerly tidal flowed, but which have not been tidal flowed at any time for a period of 40 years," and precludes the State from claiming such lands as riparian unless the State has "specifically defined and asserted such a claim pursuant to law" within the forty-year period. These cases require us once again to discuss the interplay between N.J.S.A. 13:1B-13.1 to -13.6 (Title 13), and the Amendment.

Both cases challenge the sufficiency of the State's proofs that it provided timely notice of its claim. In State of New Jersey, Department of Environmental Protection v. Township of Delanco (Delanco), the Township of Delanco (the Township) also challenges the methodology used in delineating the claim.

In <u>Lisowski v. Borough of Avalon</u> (<u>Lisowski</u>), plaintiffs William W. and Clara E. Lisowski alleged the State failed to timely assert its tideland claim against their property. This challenge came thirty years after the Supreme Court held the State had satisfied the Amendment's requirements to specifically define and assert those riparian claims shown on a particular map, Exhibit P-13 (P-13), and the base photomaps with claim overlays. <u>Dickinson v. Fund for the Support of Free Pub. Sch.</u>, 95 <u>N.J.</u> 65, 84 (1983). It is undisputed that the Lisowski property was among those claims on P-13 that were so defined and asserted. Nonetheless, the Lisowskis argued the State failed to timely assert its claim, contending <u>Dickinson</u> was not dispositive, and the State failed to present proof of timely filing in the applicable county and borough. The State of New Jersey Tidelands Resource Council (the TRC)[1] appeals from an order that granted summary judgment to the Lisowskis, clearing their title.

The disputed property in <u>Delanco</u> is an area adjacent to the Delaware River known as the "Dunes," and was not delineated in P-13. It was included on Map 448-1920, which was adopted by the

_____

[1] For ease of reference, we sometimes refer to the TRC and the State of New Jersey, Department of Environmental Protection as "the State."

TRC on September 11, 1985. The State brought a quiet title action pursuant to N.J.S.A. 12:3-8 against the Township, alleging it had claimed the property as tidelands and seeking to restrain the Township from opening a recreation park there. We granted leave to the Township to appeal from an order in which the trial court ruled the State had properly defined and asserted its claim as required by the Amendment.

We reverse the order in Lisowski, finding this disposition is required by the Supreme Court's decisions in Dickinson, supra, and City of Jersey City v. Tidelands Resource Council, 95 N.J. 100 (1983). We affirm the order in Delanco, based upon the holdings in Dickinson and Jersey City and the principles underlying our deference to administrative decisions as exemplified by City of Newark v. Natural Resource Council in Department of Environmental Protection 82 N.J. 530, cert. denied, 449 U.S. 983, 101 S. Ct. 400, 66 L. Ed. 2d 245 (1980). Although the tortured path to the delineation of the State's tidal claims has been recounted elsewhere, the issues presented here are best understood within their historical context.

I.

As the successor to the rights of the English sovereign, the colony, and later, the State, of New Jersey became the owner in fee simple of the tidelands, "'all lands that are flowed by

the tide up to the high-water line or mark.'" <u>City of Long Branch v. Liu</u>, 203 <u>N.J.</u> 464, 475 (2010) (quoting <u>O'Neill v. State Highway Dep't</u>, 50 <u>N.J.</u> 307, 323 (1967)); <u>see also</u> <u>Matthews v. Bay Head Improv. Ass'n</u>, 95 <u>N.J.</u> 306, 317-20, <u>cert. denied</u>, 469 <u>U.S.</u> 821, 105 <u>S. Ct.</u> 93, 83 <u>L. Ed.</u> 2d 39 (1984).[2] The TRC is vested with responsibility "for the stewardship of the State's riparian lands." <u>N.J.S.A.</u> 12:3-12.1.

Because this doctrine applies to "all lands that have <u>ever</u> been flowed by the tide," an uncertainty as to ownership endured that was difficult to resolve because, as the Court recognized, "it is often exceedingly difficult to determine whether a particular parcel, now dry, was once tidal flowed." <u>Gormley v.</u>

---

[2] The principle "that land covered by tidal waters belonged to the sovereign, but for the common use of all the people," <u>Borough of Neptune City v. Borough of Avon-by-the-Sea</u>, 61 <u>N.J.</u> 296, 303 (1972), has been traced to the Justinian Code, which held that

> [b]y the law of nature the air, running water, the sea, and consequently the shores of the sea were common to mankind. No one was forbidden access to the sea, and everyone could use the seashore to dry his nets there, and haul them from the sea . . . . The seashore was not private property, but subject to the same law as the sea itself, and the sand or ground beneath it.
>
> [<u>Matthews</u>, <u>supra</u>, 95 <u>N.J.</u> at 316-17 (alterations in original) (citations and internal quotation marks omitted).]

Lan, 88 N.J. 26, 29 (1981) (emphasis added). Over the course of two centuries, the State made no effort on a state-wide basis to identify the tidelands it claimed and, consequently, "private persons developed lands which arguably were state-owned." Dickinson v. Fund for the Support of Free Pub. Sch., 187 N.J. Super. 224, 227-28 (App. Div. 1982), aff'd in part and rev'd in part, 95 N.J. 65 (1983).

While the State failed to act, the Township and the Lisowskis were among the many who acquired title to property, apparently unaware it was subject to the State's tidal claim. The Lisowskis purchased their property in the 1950s from the Borough of Avalon following a public auction, built a home and have lived on the property year-round since 1991. The Township alleged it owned the Dunes based upon a "final decree on Bill to foreclose certificates of tax sale" dated March 16, 1944. The Township used part of the property as a composting facility and wanted to use the balance of the land as a recreational area.

O'Neill provides a stark example of the principle that the acquisition of property in good faith, even with the State's tacit approval, must yield to the State's dominant interest. After taking title to property in the Hackensack Meadowlands in 1953, O'Neill entered into a contract to sell the property to the State Highway Department. His widow later expended sums to

clear the title so the sale could proceed and, in 1960, delivered a deed and received the contract price from the Highway Department. O'Neill, supra, 50 N.J. at 317-18. The litigation commenced when the State claimed, after the sale, that the property was tidelands and owned by the State. Id. at 314, 317. The trial court concluded that, although the State had title to the property, it was estopped from asserting that title because of the contract between the defendant highway department and plaintiff. Id. at 314.

The Supreme Court reversed, observing, "It is settled that the State's title in tidelands cannot be lost by adverse possession or prescription" based upon the State's "delay or inaction." Id. at 320-21; see also City of Newark, supra, 82 N.J. at 546 ("In the absence of any showing that a State officer conscious of the State's interest stood by while the private owner acted in reliance thereon, the State's failure to claim tidally-flowed, interior meadowlands until the passage of Title 13 does not support an estoppel.")[3]

The case for preserving the State's claims against forfeiture lay not only in a feudal assertion of dominion; it

---

[3] Neither the Lisowskis nor the Township claim that their purchases of the property, decades ago, preclude the State from asserting its claim.

was fortified by the mandate that all funds acquired through the sale of riparian lands are committed to public education. O'Neill, supra, 50 N.J. at 321-22; N.J.S.A. 18A:56-5 ("All lands belonging to this State now or formerly lying under water are dedicated to the support of public schools. All moneys hereafter received from the sales of such lands shall be paid to the board of trustees, and shall constitute a part of the permanent school fund of the State.").[4] The Court observed, "[i]t would run against the thesis of the statute appropriating tidelands to the school fund and as well the thesis of the constitutional provision, to say that the State's title may be lost by mere inaction." O'Neill, supra, 50 N.J. at 321-22.

Still, the Court urged the State to take action:

> As a matter of good housekeeping, the appropriate officers of the State should do what is feasible to catalogue the State's far-flung holdings, but we cannot be indifferent to the difficulties involved, especially in ascertaining all the tidelands to which the State has clear or colorable title.

---

[4] In O'Neill, the Court cited the predecessor statute, N.J.S.A. 18:10-5, noting that the statute had provided for the dedication of such fund for the support of public schools "at least since 1894 (c. 71, p. 123)," and that both the present Constitution, N.J. Const. art. VIII, § 4, ¶ 2, and the Constitution of 1844, N.J. Const. of 1844 art. IV, § VII, ¶ 6, did so as well. O'Neill, supra, 50 N.J. at 321. Title 18A was enacted as a revision of the law pertaining to education, effective January 11, 1968, L. 1967, c. 271, replacing Title 18.

[_Id._ at 320.]

The legislative response was to enact Title 13, directing the Resource Development Council, a predecessor to the TRC,[5] "to undertake title studies and surveys of _meadowlands_ throughout the State and _to determine and certify those lands which it finds are State owned lands_."  N.J.S.A. 13:1B-13.2 (emphasis added).  The Legislature gave explicit direction as to how that process should be conducted, instructing the Council "shall take into account" specific categories of source material, N.J.S.A. 13:1B-13.3,[6] and establishing specific requirements for the publication of the maps showing "those lands designated by the council as State-owned lands."  N.J.S.A. 13:1B-13.4.  The statute was also explicit as to filing requirements:

> Copies of each such map and study shall be filed with the Secretary of State and sent to the clerk of each county or to the register of deeds and mortgages, whoever shall have the responsibility as the

_____

[5]  The successors to the Resource Development Council were, first, the Natural Resource Council, N.J.S.A. 13:1D-3, and then the TRC, N.J.S.A. 13:1D-18.2.  When we use "Council," we refer to the applicable entity.

[6]  The categories set forth in N.J.S.A. 13:1B-13.3 are: (1) "the mean high water line as established by the United States Coast and Geodetic Survey," (2) the nature of the meadowlands' vegetation, (3) "artificial changes in land or water elevation," and (4) such other "historical or scientific data which, in the opinion of the council, are relevant in determining whether a parcel of land is now or was formerly flowed by mean high tide."

A-0065-13T1

> recording officer of the county, and to the governing body of each municipality whose political boundaries include lands shown on the map. Such maps and studies shall be available for public inspection.
>
> [Ibid.]

In addition, the Council was required to publish "a list of those parcels designated in whole or in part as State-owned lands" at least once in a newspaper circulating in each affected county. Ibid.

The methodology initially employed by the Council was successfully challenged in 1971 and it was not until 1980 that the Supreme Court approved the methodology subsequently adopted as conforming to the requirements of Title 13. City of Newark, supra, 82 N.J. at 537, 542. The mapping of the Hackensack Meadowlands was to be completed within six months. Id. at 537, 540 n.2. The title surveys and determinations of the State's interest "in meadowlands throughout the State,"[7] were to be completed by December 31, 1980.[8] N.J.S.A. 13:1B-13.6. Neither deadline was met. Dickinson, supra, 187 N.J. Super. at 229.

---

[7] "Meadowlands" is defined in N.J.S.A. 13:1B-13.1(a) as "those lands, now or formerly consisting chiefly of salt water swamps, meadows, or marshes."

[8] The original deadline of December 31, 1974, L. 1968, c. 404 § 92, was extended twice. Dickinson, 95 N.J. 65, 74-75 (1983).

As a result, the uncertainty as to ownership continued to pit the interests of private property owners against those of the State. The Amendment was proposed to resolve these concerns by providing a time limit, running from the time when the land was last tidal flowed, in which the State was required to define and assert its claim. Dickinson, supra, 95 N.J. at 76.

The proposed Amendment was met with a great deal of resistance, including opposition from the administration, which protested that the necessary mapping could not be completed in the time allotted. Id. at 76-77. However, in the general election of November 3, 1981, the public voted in favor of the Amendment, which reads as follows:

> No lands that were formerly tidal flowed, but which have not been tidal flowed at any time for a period of 40 years, shall be deemed riparian lands, or lands subject to a riparian claim, and the passage of that period shall be a good and sufficient bar to any such claim, unless during that period the State has specifically defined and asserted such a claim pursuant to law. This section shall apply to lands which have not been tidal flowed at any time during the 40 years immediately preceding adoption of this amendment with respect to any claim not specifically defined and asserted by the State within 1 year of the adoption of this amendment.
>
> [N.J. Const., art. VIII, § 5, ¶ 1 (emphasis added).]

Thus, for the first time, State inaction within the specified time period would result in forfeiture of its claim to tidal lands. The first deadline that would extinguish all claims for lands that had not been tidally flowed for a period of 40 years was November 2, 1982. It was estimated that 2452 square miles, or 29.9 percent of the state was subject to investigation for potential claims by the State. Dickinson v. Fund for Support of Free Pub. Sch., 187 N.J. Super. 320, 327 (Law Div.), rev'd, 187 N.J. Super. 224 (App. Div. 1982), aff'd in part, rev'd in part, 95 N.J. 65 (1983).

The Office of Environmental Analysis (OEA) of the Department of Environmental Protection (DEP) was responsible for preparing the tidelands claims maps. Id. at 324. However, while the Legislature had established arduous mapping procedures for the State to follow regarding the meadowlands "to determine and certify those lands which it finds are State owned lands" pursuant to N.J.S.A. 13:1B-13.2,[9] a vacuum existed as to what action the State must take to "specifically define[] and assert[] . . . a claim pursuant to law" to preserve a riparian claim under the Amendment. Similarly, while Title 13 provided

_____

[9] The Title 13 mapping procedures were set forth in detail in the Law Division decision. Dickinson, supra, 187 N.J. Super. at 326-28.

13                                                    A-0065-13T1

explicit instructions on the manner of notice the State had to provide, N.J.S.A. 13:1B-13.4, no legislative action gave guidance to the State as to how it must provide notice to affected property owners. Dickinson, supra, 95 N.J. at 79-80.

There were two assumptions held by the plaintiffs and the State in Dickinson. First, it was assumed the State had to comply with Title 13 requirements for all tidelands claims. Second, it was believed it would be impossible to do so before November 2, 1982.[10]

With the November 1982 deadline looming, the Law Division issued its opinion on July 8, 1982. Central to the determination of what was required of the State to define its tidelands claims was P-13, which depicted the areas subject to investigation on 1632 base photomaps as squares or rectangles. Dickinson, supra, 187 N.J. Super. at 327. Squares that were fully colored represented maps that had either been delivered to the TRC for adoption or were completed by OEA and in the process of final preparation for delivery to the TRC. Ibid. There were

---

[10] Indeed, we stated the definition of "meadowlands" in N.J.S.A. 13:1B-13.1(a) was construed to include all tidelands. Dickinson, supra, 187 N.J. Super. at 230. The Supreme Court did not share this interpretation, stating, "Title 13 required that the State examine only the meadowlands," and suggesting the State had unilaterally elected to take action beyond what was required when it "decided to investigate all tidal properties in which it might have an interest." Dickinson, supra, 95 N.J. at 75.

also squares that were uncolored, which represented "areas to be delineated for tidelands claims." Ibid.

The Law Division concluded that the State had fully delineated claims as to areas covered by 767 photomaps. Id. at 340. These maps included 713 maps that had been prepared by OEA and adopted by the TRC on June 9, 1982. Id. at 327-28. The court found approximately 100 more maps would be available for adoption by the TRC by the November 2, 1982 deadline, leaving 700 maps, or forty-seven percent of the area subject to investigation, not delineated before the deadline. Id. at 328.

The court defined the actions that would serve to "specifically define[] and assert[]" the remaining claims "pursuant to law" and "fully delineate[ them] by December 31, 1985, ordering the following:

> 1. On or before November 2, 1982 the [TRC] will file a copy of P-13 with the Secretary of State, together with a copy of each base photomap (excluding those reflecting only uplands) that has not previously been filed with a scribed overlay and C.O.P.S.[11] in accordance with N.J.S.A. 13:1B-13.4.
>
> 2. Concurrent with such filing, the [TRC] will send copies of P-13 and the respective base photomaps to the clerks of the counties and governing bodies of the municipalities whose political boundaries include lands shown on such maps -- paralleling the

---

[11] Claims Overlay Preparation Summary.

distribution of published maps under N.J.S.A. 13:1B-13.4.

3. The action taken pursuant to paragraphs 1 and 2 above shall constitute compliance with Art. VIII, § 5, par. 1, of the 1947 Constitution of New Jersey, as amended, to specifically define and assert claims of the State, pursuant to law, as to lands formerly tide-flowed but not tidal flowed for 40 years prior to the amendment -- and within the one-year period provided in such amendment.

4. Notwithstanding the foregoing, all mapping, scribing, and C.O.P.S. preparation must be completed and [TRC] action taken in accordance with N.J.S.A. 13:1B-13.4 as to such claims no later than December 31, 1985.

[Id. at 340-41.]

The Appellate Division adhered to the Law Division's view that compliance with Title 13 procedures was required, holding, "unless superseded by another statute 'pursuant to law' in the amendment means pursuant to" Title 13. Dickinson, supra, 187 N.J. Super. at 241. Measuring the adequacy of P-13 against Title 13 standards, we parted company with the Law Division, concluding "the filing of P-13 and the base maps cannot constitute a specifically defined and asserted claim." Ibid. We stated: "The record is clear beyond any doubt that vast areas of P-13 will not ultimately, after accurate mapping, be the subject of a state claim. P-13 and the photo base maps simply show the area where the State may have a claim." Ibid. We

emphasized that it was not our intention "to preclude the Legislature from adopting a new statute replacing L. 1968, c. 404, or to forbid the introduction of new mapping techniques." Id. at 243. However, in the absence of such legislative action, we held the State's tideland property "claim must be specific as to each property and must be prepared in accordance with the procedures approved in [City of Newark], supra, 82 N.J. at 530." Failure to do so would bar the claim. Ibid.

The Appellate Division decision was rendered on October 22, 1982, less than two weeks before the November 2, 1982 deadline. With the matter before the Supreme Court after cross-petitions for certification were granted, the parties entered into a consent order, dated October 26, 1982, to govern "pending the ultimate disposition" of the appeal, without prejudice to the positions of any of the parties. Acknowledging certain practical difficulties regarding the reproduction of P-13, the order required the TRC to file a substitute document, P-13(S) and "a copy of each base photomap (excluding those reflecting only uplands) that has not previously been filed with a scribed overly and Claims Overlay Preparation Summary" with the Court, the Secretary of State and "the Clerks of the counties and governing bodies of the municipalities whose political

boundaries include lands shown on such maps" by November 2, 1982.

In a sharp departure from the conclusions drawn by this court and the Law Division, as well as the assumptions of the parties, the Supreme Court concluded the State was not required to comply with Title 13 to preserve riparian claims from extinguishment under the Amendment. The Court set forth several reasons for its conclusions, which included the fundamental difference between the objectives of Title 13 and the Amendment. While Title 13 "delineated a methodology . . . to enable the Council 'to determine and certify those lands which it finds are State owned lands,'" Dickinson, supra, 95 N.J. at 78 (quoting N.J.S.A. 13:1B-13.2), the Amendment merely called for a procedure "in which the State proposes to assert a claim." Ibid. The Court explained, "[d]etermination and certification that lands are owned by the State call for more stringent requisites than simply asserting a claim." Ibid.

The nature of the properties to be mapped also warranted a distinction in the applicable standards. The Court observed that studies of the meadowlands properties subject to Title 13 "may involve factors substantially different from those involved in oceanfront properties." Ibid.

The third point made by the Court was that, given their disparate purposes, it was "obvious" that claims pursuant to the Amendment "could be defined and asserted in ways different from that prescribed in Title 13." Ibid. The Court stated it was "self-evident" from Title 13's requirements that "the people's intent was not that restrictive," and that the imposition of Title 13 procedures would result in "an unnecessary impairment of [the Council's] administrative flexibility." Id. at 78-79. The Court noted that Title 13's requirements, including "the preparation of a survey and publishing of a map, which must be filed with the Secretary of State and sent to the clerk of each county and municipality where the land is situated," ibid. (citing N.J.S.A. 13:1B-13.4), was "consonant with the legislative (Title 13) imperative that the State certify ownership, a requirement that need not be satisfied under the Amendment." Id. at 79. As a result, the delineation and notice requirements under the Amendment are substantially less stringent:

> Descriptions of the land, whether in the form of a map or otherwise, notice to the landowners, the amount and nature of evidence necessary to make a claim under the Amendment -- all could justifiably differ from Title 13, particularly since the purposes of Title 13 and the Amendment are not identical. Restricting the Council to Title 13 procedures would be an unnecessary

A-0065-13T1

> impairment of its administrative flexibility.
>
> [_Ibid._]

Moreover, the Court explicitly recognized that the administrative flexibility afforded the Council encompassed the authority to utilize a methodology untethered to Title 13 procedures. "That the Council generally employed the Title 13 procedures in non-meadowlands areas, a program initiated in 1973, long before the Legislature considered the proposed Amendment, does not vitiate the Council's authority to utilize another methodology." _Ibid._ (emphasis added). Even in the absence of legislative action, the Council's authority includes "the right to survey, map, and determine the boundaries of" "lands that the State claims it owns." _Id._ at 79-80 (citing N.J.S.A. 12:3-7, 12:3-10, 12:3-12, 13:1B-13, 13:1B-13.7) (emphasis added).

Having dispatched the notion that the State was required to comply with Title 13 procedures, the Court turned to the question whether the mapping and notification procedures followed had satisfied the delineation and notice requirements that were constitutionally required, stating:

> [W]e believe that where the State's mapping reached the point that it designated the place where the tide had flowed, as shown on its claim overlays, the Amendment's specific delineation requirement has been met. We

> respect this administrative judgment of the Council. See [City of Newark], supra, 82 N.J. at 539-40. Unquestionably the Council has acted in good faith by making claims for which it has a reasonable basis.
>
> . . . .
>
> We are satisfied that the State has "asserted" as well as "specifically defined" its riparian claims. The public has been given notice of the State's claims. The claimed areas are shown on P-13 and the base photomaps with the claim overlays. All have been filed with the Secretary of State and county and municipal clerks.
>
> [Id. at 84 (emphasis added).]

Jersey City, decided the same day as Dickinson, also concerned challenges to certain tidelands claims, premised on the assumption that Title 13 applied. Among the alleged deficiencies was "the State's failure to file the maps with the Secretary of State, keepers of county land records, and municipal clerks, as required by N.J.S.A. 13:1B-13.4." Jersey City, supra, 95 N.J. at 102. The Court disposed of this argument, stating, "We have held this day in Dickinson that the State specifically defined and asserted its claims to those lands for which it had prepared and published base photomaps with claim overlays that it filed with the appropriate governmental offices. No more than that is mandated by the Amendment." Id. at 104 (citing Dickinson, supra, 95 N.J. at 84).

A-0065-13T1

In sum, the following is derived from the Court's opinions and informs our analysis. Although the Supreme Court broadly described the constitutional imperatives, it did not define with particularity a procedure that was constitutionally required. However, the Court held compliance with Title 13 procedures was not required and that the State had satisfied constitutional requirements as to claimed areas shown on P-13 and base photomaps with claim overlays. Further, the Court repeatedly acknowledged that the exercise of administrative authority in this context is entitled to deference.

## II.

It is undisputed that the Lisowskis' property is part of Map 084-1974, the Oldman Creek Map, which was among the 713 maps listed in the TRC's minutes for May 27, 1982 as approved for publication that day, and among the colored squares on P-13.

In December 2005, the Lisowskis applied for a "Statement of No Interest" with the TRC seeking a declaration that the State had no interest in the land. The State responded, approximately two years later, denying their application and asserting a tidelands claim to nearly one hundred percent of their land. Plaintiffs filed a quiet title action, alleging the TRC had

failed to timely assert a tideland claim against their property as required by the Amendment.[12]

Plaintiffs conceded the map had been timely filed with the Secretary of State, but argued the State failed to timely file the map with either Cape May County or the Borough of Avalon because the County's copy bore a date stamp of December 14, 1982, and the Borough did not have the map in its possession. The State was unable to produce receipts from its files to demonstrate the timely filing of the maps with the County and the Borough and relied upon circumstantial evidence to support its contention that the maps had been timely filed with the applicable counties and municipalities.[13] In addition, the State argued that it was not required to file the maps with the County and Borough; that filing with the Secretary of State was sufficient.

Cross-motions for summary judgment were filed. Citing Dickinson, the trial judge initially ruled that the State had

---

[12] In the first count of their complaint, the Lisowskis alleged the Borough breached the covenant of warranty in the property deed. In July 2013, the parties entered into a consent order that dismissed this count without prejudice.

[13] The records in both Lisowski and Delanco reveal deficiencies in the State's recordkeeping and that, in the absence of any legislative directive, the counties and municipalities did not accept and maintain the maps in a uniform and reliably accessible manner.

properly asserted its claim, despite the fact the State could not produce direct evidence the Oldman Creek Map had been filed in the Borough or that it had been filed with the County before December 14, 1982.

Plaintiffs and the State filed cross-motions for reconsideration. Citing Dickinson, and Jersey City, plaintiffs argued the State was required to file the map with both the County and the Borough and failed to do so. The State asked the court to reconsider its finding that there had been no timely filing with the County, presenting a newspaper article that reported the widespread nervousness and confusion of property owners in response to the County's receipt of the tideland claim maps on May 28, 1982.

The trial court vacated its prior order, granted plaintiffs' motions for reconsideration and summary judgment, and denied the TRC's motion for reconsideration. The State filed a second motion for reconsideration, supported by additional circumstantial evidence, including a June 1982 article from the New York Times describing practical difficulties posed to the clerk's office by the receipt of the maps and minutes from the June 24, 1982 TRC meeting which noted continued discussion "concerning the paper copies of the tidelands maps which have been delivered to 13 counties and 194

municipalities." The trial court found the evidence presented failed to prove the specific map in question was timely filed and denied the State's motion for reconsideration.

In its appeal, the State argues that <u>Dickinson</u> constitutes binding precedent that its assertion of its tidal claim satisfied the Amendment; that it is only required to file a tidelands claims map with the Secretary of State; and that the proofs support the conclusion that the Oldman Creek Map was filed in the County and Borough. In the alternative, the State requests a remand. The Lisowskis argue the trial judge correctly ruled the State was required to file the map with the County and Borough in addition to the Secretary of State and that the State failed to provide sufficient proof of filing. The Lisowskis also argue <u>Dickinson</u> does not dispose of this issue and that a remand is inappropriate.

In reviewing a summary judgment decision, we apply the same standard as the trial court. <u>Murray v. Plainfield Rescue Squad</u>, 210 <u>N.J.</u> 581, 584 (2012). Viewing the evidence "in the light most favorable to the non-moving party," we determine "if there is a genuine issue as to any material fact or whether the moving party is entitled to judgment as a matter of law." <u>Rowe v. Mazel Thirty, LLC</u>, 209 <u>N.J.</u> 35, 38, 41 (2012) (citing <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 <u>N.J.</u> 520, 529 (1995)). We

review questions of law de novo, State v. Gandhi, 201 N.J. 161, 176 (2010), and need not accept the trial court's conclusions of law. Davis v. Devereux Found., 209 N.J. 269, 286 (2012).

In this case, the factual issue of whether the Oldman Creek Map was timely filed with the County and Borough was resolved by the Court's holding in Dickinson. Although the Court did not detail evidence to support its conclusion, its holding does not suffer from ambiguity:

> The claimed areas are shown on P-13 and the base photomaps with the claim overlays. All have been filed with the Secretary of State and county and municipal clerks.
>
> [Dickinson, supra, 95 N.J. at 84.]

The meaning of the holding was emphasized by the decision it rendered the same day in Jersey City:

> We have held this day in Dickinson that the State specifically defined and asserted its claims to those lands for which it had prepared and published base photomaps with claim overlays that it filed with the appropriate governmental offices.
>
> [Jersey City, supra, 95 N.J. at 104.]

The Lisowskis and amicus argue that this holding is not binding here because the elements of res judicata have not been met. We disagree.

In Dickinson, the Court declared it was addressing "the meaning and constitutionality" of the Amendment. Id. at 70. In

its consideration of the meaning of the Amendment's requirement that the State specifically define and assert its claim, the Court reviewed what the State had done and not done to investigate the properties identified in the squares depicted on P-13. The Court agreed with that part of the Appellate Division's decision that stated "specific delineation . . . on a property-by-property basis" was required for a claim to be made in good faith. Id. at 83 (quoting Dickinson, supra, 187 N.J. Super. at 242-43). The Court concluded, "where the State's mapping reached the point that it designated the place where the tide had flowed, as shown on its claim overlays, the Amendment's specific delineation requirement [had] been met" and the administrative judgment of the Council warranted the Court's respect. Id. at 84.

As we have noted, the Lisowskis do not dispute that their property lies within one of the colored squares on P-13 that the Court found had been adequately delineated. Yet, they contend the second component of the Court's holding as to those colored squares -- that the State sufficiently asserted its claim -- does not preclude their argument that the State failed to do so as to their property.

It is true the Court did not detail the State's efforts on a property-by-property basis to file with the appropriate county

and municipality. However, as part of its review of the procedural history, the Court noted the parties entered into a consent order pending disposition, which required the State to follow the filing requirements set forth in the Law Division order. Id. at 73. Those requirements were to be satisfied by November 2, 1982. The case was argued before the Supreme Court on September 12, 1983 and decided on December 21, 1983. This was a vigorously litigated case. We have no doubt that, if the State failed to follow the dictates of the consent order, that issue would have been raised and more fully discussed in the Court's decision. It is implicit in the Court's statement, "All have been filed with the Secretary of State and county and municipal clerks," id. at 84, and its characterization of its conclusion as a holding, id. at 90; Jersey City, supra, 95 N.J. at 104, that the Court was satisfied the State had complied with the consent order as to all properties that were sufficiently delineated on P-13.

Collateral estoppel, or issue preclusion, bars the relitigation of an issue that has been addressed in a prior matter, if

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the

determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

[First Union Nat'l Bank v. Penn Salem Marina, Inc., 190 N.J. 342, 352 (2007) (citation and quotation marks omitted).]

Finding these elements are satisfied here, we hold Dickinson establishes that the State timely preserved its riparian claim to the Lisowski property by filing the Oldman Creek Map with the Secretary of State, the County and the Borough. The trial judge was not free to reach a contrary result. See Reinauer Realty Corp. v. Borough of Paramus, 34 N.J. 406, 415 (1961); Crespo v. Crespo, 408 N.J. Super. 25, 36-37 (App. Div. 2009), aff'd, 201 N.J. 207 (2010); Petrusky v. Maxfli Dunlop Sports Corp., 342 N.J. Super. 77, 81 (App. Div.), certif. denied, 170 N.J. 388 (2001). Accordingly, we reverse the order granting summary judgment to the Lisowskis and remand this matter for the entry of summary judgment in favor of the State.

III.

The State's tidelands claim of the Dunes, the property at issue in Delanco, is included on Map 448-1920. Because this map was not adopted by the TRC until September 11, 1985, it was not among those explicitly approved by the Supreme Court in

29

A-0065-13T1

Dickinson.  The Township argues the State failed to properly delineate its tidelands claim and failed to prove it provided adequate notice of its claim.  The trial judge rejected the Township's arguments and, in a written opinion, found the State had met its burden regarding both the delineation and assertion of its claim.  We agree.

A.

We first turn to the argument that the State failed to properly delineate its claim.  The Township argues that, to satisfy its constitutional obligation, the TRC was required to follow a specific procedure set forth in a 1987 OEA report.  The Township further contends that, as a result of this failure, the TRC based the claim upon an erroneous source selection, improperly included vegetation and marsh areas in the claim, and improperly delineated the claim.

The protocol the Township relies upon is set forth in a 1987 report by Richard Castagna, a supervisor in the OEA, titled, "The Tidelands Mapping Process" (the Castagna Report).  The Report describes the "24 step procedure followed by the OEA when mapping tidelands."  Although she was critical of the Castagna Report in some respects, the Township's expert witness, Jo Ann Cubberley, agreed the Castagna Report was an accurate representation of the tidelands mapping process.  The Township

contends the State was required to comply with the procedure outlined in the Castagna Report to satisfy its constitutional obligation. We disagree.

The alleged deficiency concerns the second step of the twenty-four step procedure, which addresses the selection of a source for the mapping process. A source is chosen after all available source materials, including aerial photographs, historic maps, and charts from the files of the Bureau of Tidelands Management (Bureau), along with maps from outside sources, have been obtained and a log book is created to track the analysis of each source. According to the Castagna Report, the analyst reviews the collected sources "in chronological order, beginning with the most recent materials and ending with the oldest (earliest) sources" to determine the "natural or artificial (man-altered) status of an area." Section 2(B) of the procedure states:

> For each area subject to analysis, a specific source is chosen for the delineation of the State's tidelands claim. The most recent . . . source is used if source analysis does not demonstrate artificial change, i.e., filling or dredging. If source analysis does demonstrate artificial change, an approved source which predates that change is chosen by chronologically examining all approved sources beginning with the most recent materials. <u>When that examination yields the latest source prior to artificial change, that source is used for delineation</u>.

[(emphasis added).]

The Castagna Report also explained that the latest source prior to filling or dredging was not used on occasion "because not all surveys, maps and charts that are examined meet certain delineation standards." When a source material fails to meet enumerated criteria or is rejected "because of shadow, vegetation, canopy overhang, etc., which may obstruct the [analyst's] view of details," the analyst may use "either earlier or later sources clearly depicting those portions" for consultation and delineation. In addition to following these steps, the procedure states that for maps prepared after the Amendment, "the latest source which shows the least alteration within the latest 40-year period is selected for delineation." Any rejected source was "considered to be of collateral value in that it may provide additional support and/or clarification for delineations derived from approved sources."

Steps 17, 18 and 19 of the twenty-four step procedure call for reviews by the analyst's immediate supervisor, the supervising environmental specialist, and the chief of the group, before the base photomap is sent to the contractor for scribing, "to ensure that all delineation rules have been followed." During the supervisor's review, "[a]ll sources for the map being reviewed" are forwarded to the supervisor. Step

32

17(B) states, "The supervisor enters review approvals in the log book along with any changes to be made to the [a]nalyst's delineation and with all reasons for such change."

The Township and State agree to the following. The Dunes property was artificially filled and the 1956 aerial photography showed the first evidence of artificial change. The most recent source prior to the 1956 photographs was aerial photographs taken in February and April 1951. If those photographs were properly rejected, photographs from 1946 constituted the next available source.

The Township contends that, pursuant to the procedure outlined in the Castagna Report, the April 1951 photographs should have been the source relied upon in delineating the tidelands claim. The State maintains that the OEA analyst for the Dunes Map, Michael Claffey, correctly selected aerial photographs from March 12, 1946, as the source for delineation.

The analyst's log book acknowledged there was aerial photography available from 1951, but rejected it as a source because "[t]he 1951 PAN[14] is not a clear product and is covered by ice." In rejecting these photographs, the log book did not differentiate between photographs taken in April 1951, which did not have ice, and photographs taken in February 1951. Pursuant

---

14  "PAN" refers to the panchromatic photographs.

to the procedure outlined in the Castagna Report, Claffey's log book and selections were reviewed and approved by three supervisors: Castagna, another "principal environmental specialist," and the supervisor of the group.

Both the State and the Township presented expert testimony to support their arguments.

At trial, Castagna acknowledged that neither his report nor the logbook differentiated between the two 1951 sources. However, he testified both would have been properly rejected. He explained that two of the three April frames depicted the Dunes in the extreme corners of the photographs, making the images blurry. Therefore, the April 1951 photographs could not be used for a stereographic analysis because two clear pictures were needed. In contrast, the 1946 aerial photographs yielded two quality frames and clearly depicted the property.

Cubberley, the Township's expert, was the former Chief of the Bureau and the Deputy Manager of OEA. She disagreed with the tidelands delineation on the Dunes map and opined that OEA had failed to follow its own protocol in the selection of the 1946 photography as the source for its delineation. She conceded the 1946 photography was appropriate for one portion of the watercourse delineation, but opined the 1951 photographs should have been used for the other two watercourses and the

shoreline. She stated that, as a result of the improper source selection and erroneous assumptions made by the analyst, large areas were improperly included in the delineation.

Cubberley also alleged that tide mudflats were claimed in a manner not in accord with the rules at the time. At trial, Cubberley admitted there were no written directives prohibiting the claiming of mudflats while delineating the tidelands claims. In fact, the State produced evidence showing Cubberley had approved delineations that included mudflats. Castagna opined that mudflats could be identified using panchromatic photographs and that the analyst properly identified same consistent with the PAN-1 key.[15]

In her written opinion, the trial judge carefully reviewed the testimony provided by each of the experts and her own examination of the photographs under a stereographic microscope. She found that Cubberley's selection of the 1951 photographs as source material was "based on an inferior process." Based upon her own review of the 1951 photographs and the expert testimony, the trial judge found, "it is more likely than not that the 1946

---

[15] "PAN-1 key" refers to an OEA document, titled "Tidelands Delineation Key, Identification of Tidal Watercourses from Panchromatic Photography," which analysts were instructed to use to assist them in identifying natural tidal watercourses and artificially altered natural watercourses.

frames were the proper selected source to use to delineate this area."

The trial judge also made findings regarding the conflicting testimony on the delineation process and the inclusion of mudflats in the claim. She found the State had shown by a preponderance of the evidence that it had properly delineated its claim.

The Township also argues that reversal is required because the trial judge erred in reaching these conclusions, specifically challenging her factual findings. We reject this argument because the trial judge's findings are supported by "adequate, substantial and credible evicence," Town of Kearny v. Brandt, 214 N.J. 76, 92 (2013) (citation and internal quotation marks omitted), and were evidently influenced by her ability to assess the credibility of the witnesses, State v. Johnson, 42 N.J. 146, 161 (1964). They are entitled to our deference.

The issue whether the procedure followed here satisfied the State's constitutional obligation is a legal question which we review de novo. Zabilowicz v. Kelsey, 200 N.J. 507, 512-13 (2009). We have a limited role in reviewing the actions of administrative agencies. Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs, 186 N.J. 5, 15-16 (2006). "'[T]he fundamental consideration is that a court may not substitute its judgment

for the expertise of an agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable.'"  Ibid. (quoting Williams v. Dep't of Human Servs., 116 N.J. 102, 107 (1989)).

City of Newark involved a challenge to maps that, unlike this case, were adopted by the Natural Resource Council (NRC) under Title 13.  City of Newark, supra, 82 N.J. at 534-35.  The appellants sought to invalidate thirty-six Hackensack Meadowlands base maps with claims overlays and a Newark-Elizabeth base map with its claims overlay on the ground that the NRC failed to comply with the requirements established by the Legislature in N.J.S.A. 13:1B-13.3.  Id. at 537-38.  Two of the arguments parallel challenges in this case.  The appellants contended the NRC did not comply with the Legislature's requirement that it "take into account" four categories of source material specified in N.J.S.A. 13:1B-13.3, ibid., and also found fault with the NRC's methodology in analyzing the data.  Id. at 538-39.

At the outset, the Court noted "the strong presumption of reasonableness that an appellate court must accord an administrative agency's exercise of statutorily delegated responsibility."  Id. at 539.  The Court reviewed principles that remain applicable today.  See Lavezzi v. State, 219 N.J.

163, 171-72 (2014); <u>State (Div. of State Police) v. N.J. State Trooper Captains Ass'n</u>, 441 <u>N.J. Super.</u> 55, 61-62 (App. Div. 2015). "[C]ourts are not free to substitute their judgment as to the wisdom of a particular administrative action for that of the agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable." <u>City of Newark</u>, <u>supra</u>, 82 <u>N.J.</u> at 539 (quoting <u>N.J. Guild of Hearing Aid Dispensers v. Long</u>, 75 <u>N.J.</u> 544, 562-63 (1978)).

> If there is <u>any fair argument</u> in support of the course taken [by the agency] or <u>any reasonable ground for difference of opinion</u> among intelligent and conscientious officials, the decision is conclusively legislative, and will not be disturbed unless patently corrupt, arbitrary or illegal.
>
> [82 <u>N.J.</u> at 539-40 (alteration in original) (quoting <u>Flanagan v. Civil Serv. Dep't</u>, 29 <u>N.J.</u> 1, 12 (1959)).]

The Court further observed that the presumption of reasonableness "is even stronger here as the agency has been delegated discretion to determine the specialized and technical procedures for its tasks." <u>Id.</u> at 540.

Notwithstanding the specific requirements of Title 13, the Court stated <u>N.J.S.A.</u> 13:1B-13.3 vested "[b]road discretion . . . in the NRC," and that the NRC had "exercised its delegated discretion in choosing not to incorporate some historical materials." <u>Id.</u> at 540-41. NRC's consideration of materials

identified in the statute was sufficient to "take [them] into account," even though the NRC ultimately determined not to rely upon them. <u>Ibid.</u> The Court concluded, "[T]he evidence adduced indicates only a difference of opinion between the appellants' and the NRC's experts." <u>Id.</u> at 541. Finding genuinely debatable issues regarding the NRC's exercise of its discretion, the Court affirmed the Appellate Division's determination that "the NRC's maps represent a reasonable implementation of the duty mandated in <u>N.J.S.A.</u> 13:1B-13.2 and 13:1B-13.3." <u>Id.</u> at 541-42.

Two salient points in the Court's analysis in <u>Dickinson</u> were its recognition that the Council's administrative authority to define and assert its claim should not be unduly restricted and its conclusion that the imposition of Title 13 requirements would do so. <u>Dickinson</u>, <u>supra</u>, 95 <u>N.J.</u> at 78-79. As in <u>City of Newark</u>, <u>supra</u>, 82 <u>N.J.</u> at 540, the TRC was tasked with implementing "specialized and technical procedures." Unlike that case, however, there were no legislative mandates to govern the procedure it followed. It is an ineluctable conclusion that the TRC's discretion in implementing its own procedures can be no less broad than the NRC's discretion in implementing legislative requirements. The evidence here similarly reveals "only a difference of opinion" between experts. <u>See id.</u> at 541.

The TRC's determination is therefore entitled to our deference and will not be disturbed.

B.

We next turn to the Township's argument that the State failed to prove it had timely provided notice of its claim. The State filed the map with the Secretary of State on December 12, 1985, as shown by a stamped receipt retained by the Bureau. Although a copy of the map was also on file at the County, there was no stamp indicating when the map was filed. There was also no signed receipt for delivery to the Township. The State argues that filing with the Secretary of State satisfies its burden to provide notice. We need not examine the parameters of the notice necessary to satisfy the Amendment[16] because we conclude the trial judge's determination that the State provided notice to the County and the Township was supported by

---

[16] We note the State has launched several online tools to assist members of the public in determining whether certain property is in an area that is the subject of a tidelands claim. See State of New Jersey, Department of Environmental Protection, Division of Land Use Regulation, Before you Buy, Before you Build, http://www.nj.gov/dep/landuse/bybob.html (last updated July 6, 2015); State of New Jersey, Department of Environmental Protection, Bureau of GIS, NJ-GeoWeb, http://www.nj.gov/dep/gis/geowebsplash.htm (last updated July 20, 2015); State of New Jersey, Department of Environmental Protection, Division of Land Use Regulations, Tidelands, http://www.nj.gov/dep/landuse/tl_main.html (last updated July 30, 2015).

sufficient credible evidence in the record.  See Kearny, supra, 214 N.J. at 92.

The trial judge cited the following evidence to support her conclusion the State properly asserted its claim.  The base map and overlay was filed with the Secretary of State on December 12, 1985.  There was a copy of the base map and overlay "on file with the County" that did not have a date stamp reflecting when it was received.  Although there was no record of the Township's receipt, the Township passed resolution 1986-32 on June 23, 1986, authorizing the Delanco Sewage Authority to apply for a riparian grant to use portions of the Dunes.  The application for this grant contained a map with the same tidelands claim line that appears on Map 448-1920.  The trial judge reasoned that the Township's reliance upon the map demonstrated it "had the map showing the claims within a year of its filing with the Secretary of State."  The judge also found credible the rather extraordinary testimony of Nicholas Morgan, who, before his retirement, worked at the Bureau.  Morgan testified he specifically remembered delivering maps to the Township of Delanco on Monday, November 18, 1985.  The specificity of this recollection could justifiably be met with skepticism.  However, Morgan was also able to testify as to the exact start and end dates, including the day of the week, for each job he held from

1967 through his retirement in 2011.  The judge stated, "His memory of dates and days of the week is exceptional among people, but in saying this, the court also had the ability to observe his demeanor and concludes he was credible."

As the Township acknowledges, the State was required to prove it provided notice by a preponderance of the evidence. See Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006). This standard requires proof "that a desired inference is more probable than not.  If the evidence is in equipoise, the burden has not been met."  Ibid. (quoting Biunno, Current N.J. Rules of Evidence, comment 5a on N.J.R.E. 101(b)(1) (2005)).  The judge's determination here that the State met this burden was supported by sufficient, credible evidence in the record and is entitled to our deference.  We therefore affirm the trial judge's decision that the State properly delineated and asserted its claim in compliance with the requirements of the Amendment.

We reverse the order granting summary judgment in Lisowski and remand for entry of summary judgment in favor of the State. We affirm the Delanco court's order memorializing its findings that the State properly defined and asserted its claim on Map 448-1920.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0065-13T1